## BIGELOW *against* THE HARTFORD BRIDGE COMPANY.

A bill in equity for an injunction against a public nuisance, will not be sustained, unless it shews a particular injury to the plaintiff, distinct from that which he suffers in common with the rest of the public.

To authorize a court of equity to interpose its power, by the summary, peculiar, and extraordinary remedy of injunction, there must be *not only a violation of* the plaintiff's rights, but such a violation as is, or will be, attended with substantial and serious damage.

Therefore, where the owner of land and buildings above and adjoining the causeway of the *Hartford Bridge Company,* which causeway having been carried away, by water and ice from *Connecticut* river, was about to be rebuilt, under the direction of a committee appointed by the general assembly for that purpose, sought, by bill in equity, an injunction to restrain such company from rebuilding their causeway in the manner directed by such committee, and the committee from approving or accepting it, when so rebuilt, and also to enjoin the removal thereof, so far as it had already been constructed ; and, on the hearing, it was found, that the decay and depreciation of the plaintiff's property, in consequence of the structure complained of, the repairs thereby rendered necessary, and the inconvenience resulting therefrom to the plaintiff, were small, not capable of appreciation, and not such

*Hartford,*
*June, 1842.*

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

as would materially lessen the intrinsic value of the plaintiff's property; it was held, that the injury was not sufficient in point of magnitude to justify the interposition of the court in the manner sought.

Assuming that the legislative acts under which the *Hartford Bridge Company* are proceeding, form, virtually, a contract between that corporation and the neighbouring proprietors; that the committee appointed to superintend the rebuilding of the causeway, have misconstrued and exceeded their powers; and that the doings of the corporation are unauthorized; it does not follow, that a court of equity will, irrespective of the injury resulting to the plaintiff, grant an injunction, on the principles on which courts of equity proceed in enforcing the specific execution of contracts.

A state of things from which the plaintiff apprehends injurious consequences to himself, but which neither actually exists, nor is threatened by the defendants, nor is inevitable, is not a sufficient ground for an injunction.

THIS was an application, by bill in equity, for an injunction to restrain the *Hartford Bridge Company* from rebuilding the causeway from their bridge *Eastward* through the *East-Hartford* meadows, bordering on *Connecticut* river, in the manner authorized and directed by the committee appointed by a resolution of the General Assembly in 1841, to whose acceptance such causeway was to be rebuilt, in the manner prescribed in said resolution; and to restrain the committee from authorizing, approving or accepting the causeway, when so rebuilt; and also to enjoin the removal thereof, so far as it had been then constructed under their authority and direction.

The bill in substance stated, That said committee, in the particular therein mentioned, had put an erroneous construction upon said resolution, in regard to the amount of sluiceway for back water, thereby required; and also in regard to the height to which the company are obliged by law to erect and keep the causeway; that under a misapprehension of their powers, they had exceeded them, and authorized and directed the company to rebuild the causeway in conformity with such erroneous construction, and pledged themselves to the company to accept of it, if so rebuilt; that the company were then rebuilding and proceeding to complete it, according to said directions; that when so completed, it would, in times of flood, stop the water, which has heretofore been accustomed to flow through the space formerly occupied by the dry-bridge, where the causeway was then to be rebuilt, by which the water of the river, at such times, above the causeway, would rise more frequently, and to a greater height, than it

has been accustomed to do ; and that thereby the dwelling-house and property of the plaintiff, *North* of, and adjoining to, the causeway, and the property of others *North* of the cause-way, would be inundated, more frequently, to a greater depth, and for a longer time, and be in imminent danger of being swept away, by the floods and ice of the river ; that the diffi-culty and danger of passing on the causeway would be in-creased, by the depth and more rapid flow of the water ; the property of the proprietors above and below the causeway, greatly injured and permanently diminished in value ; and the dwelling-house of the plaintiff permanently diminished in value, and destroyed.

*Hartford,*
*June, 1842.*

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

At a hearing before the superior court, *September* term, 1841, the following facts were found.

The *Hartford Bridge Company* was created a body politic and corporate, by an act or resolution of the General Assem-bly of this state, passed at the *October* session thereof, in the year 1808, with certain powers and privileges, and subject to certain duties, conferred and imposed by such act or resolu-tion. *Private Stat.* 254. Shortly afterwards, the corpora-tion erected a bridge across *Connecticut* river, and built a causeway from the *Easterly* end of the bridge through the *East-Hartford* meadows bordering on the river.

By an extraordinary flood in the river, occurring in the year 1818, the bridge was swept away and destroyed. At the subsequent session of the General Assembly in *May*, 1818, an act or resolution was passed, on the petition, and with the assent, of said corporation, in addition to, and alteration of, the original charter of incorporation. By this act or resolu-tion it was provided, That the company should rebuild the bridge, within eighteen months, raising the piers to the accept-ance of the commissioners on the bridge, making a suitable draw over the channel of the river, &c., and that the cause-way should be raised to the acceptance of the commissioners, not to exceed three feet higher than it then was ; and unless said bridge should be so rebuilt, and said causeway so repair-ed, it should be lawful for the towns of *Hartford* and *East-Hartford* to revive the ferry, and improve the same, in the same manner, and with the same privileges, as if said ferry had not been discontinued. *Private Stat.* 258.

The corporation rebuilt the bridge, and raised the cause-

*Hartford,*
*June, 1842.*

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

way pursuant to, and as was required in and by, said additional act, complying in all respects therewith.   In the causeway so rebuilt and raised, there was the whole length and amount of bridging required by the original charter, *viz.* 60 rods of bridging in the whole length of the causeway.

Afterwards, in the year 1825, a part of the causeway and bridging having got out of repair, and being in such a state that it would soon be necessary to be rebuilt, the corporation made a representation thereof to the General Assembly, holden in that year; whereupon the General Assembly, by the assent of the corporation, passed an act or resolution to the following effect : " That the commissioners appointed by the General Assembly to superintend the affairs of said company, with the assent and concurrence of the select-men of the towns of *Hartford* and *East-Hartford*, be, and they hereby are, authorized and required to inspect the rebuilding of said road, with such bridges as they shall deem necessary, and to direct in what manner, and of what materials, the parts to be so rebuilt shall be constructed."

The corporation soon afterwards rebuilt said road or highway, and bridges therein mentioned, under the superintendance and inspection of the commissioners therein mentioned, and with the assent and concurrence of the select-men of the towns of *Hartford* and *East-Hartford*, and according to the direction of said commissioners as to the manner in which, and the materials of which, said road and bridges should be rebuilt.   When the road, or causeway, and bridging, was so rebuilt, under and in pursuance of the last-mentioned act or resolution, the length of bridging in, and composing a part of, said causeway, was reduced from its former length, to a less length, *viz.* to the length of about 400 feet.

The bridging so rebuilt, usually called the dry-bridge, and the ends of the causeway adjoining thereto, were, in the month of *January*, 1841, swept away, by an extraordinary flood in *Connecticut* river, the waters whereof, in time of high floods, are accustomed to flow in a rapid and deep current, from the river above, and *North* of, the causeway, over its banks, down to, over and upon the causeway, and under the dry-bridge.

The waters of *Connecticut* river have been accustomed, for many years, to set back through three ravines, or large drains, a considerable distance above the causeway,

and to pass through the *Eastern* channel, and through the causeway, at the place where the dry-bridge stood, and under it, in a broad, deep and rapid current, before they overflowed the causeway, or the banks of the river, at the lowest place.

*Hartford,*
June, 1842.

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

This causeway is necessary for the public to pass and re-pass, and is constantly used for that purpose.

In *May*, 1841, the *Hartford Bridge Company* preferred their petition to the General Assembly, which was legally served upon the town of *East-Hartford,* and after a full hearing thereon, the General Assembly passed the following resolution : " That in repairing and rebuilding the causeway between the towns of *Hartford* and *East-Hartford,* the *Hartford Bridge Company* may, and they are hereby authorized to, rebuild the same permanently of stone ; provided they leave such sluices for back-water as shall, in the opinions of *Eli Whitney Blake* and *Henry Farnham*, of *New-Haven,* and *Roswell B. Mason*, of *Bridgeport,* (who are hereby appointed a committee for that purpose,) be equivalent to the bridging required by the existing provisions of law ; and provided said causeway be rebuilt to the acceptance of said committee."

Soon after the passage of this resolution, the corporation, being about to commence and prosecute the repairing and rebuilding of their causeway through *East-Hartford* meadows, in the manner authorized and provided in said resolution, applied to the committee therein mentioned, and requested their opinion and judgment as to the manner in which said resolution required and authorized the corporation to repair and rebuild the causeway, and as to what mode of repairing and rebuilding it, under and in pursuance of said resolution, would be acceptable to said committee, and meet with their approbation, and as to what sluices in the causeway for back-water, would, in their opinion, be equivalent to the bridging required by the existing provisions of law ; to which application and request, said committee, on the 5th day of *July,* 1841, replied, by a letter sent and delivered to said corporation, of which the following is a copy : " The undersigned, a committee in relation to the *Hartford Bridge Company,* appointed by a resolution of the legislature, at their session in *May,* 1841, having been called out, by the *Hartford Bridge Company,* to give their opinion on the question referred to said

*Hartford,*
*June, 1842.*

*Bigelow*
*v.*
The Hartford
Bridge Com-
pany.

committee, by the legislature ; and having viewed the ground, and thoroughly considered the subject, give their opinion as follows, *viz.* The space heretofore occupied by the dry-bridge bears so small a proportion to the whole section of the stream in the time of high floods, that if it were entirely filled up, with solid mason-work, the effect to produce a greater elevation of the water above the bridge, at such times, would be scarcely appreciable.

"If in filling up this space, the mason-work, together with the adjoining ends of the present causeway, were left 1½ or 2 feet lower than the dry-bridge was, the effect of this depression to prevent a contraction of the stream, by an accumulation of ice at that point, would, in the opinion of the committee, fully counterbalance the impediment which the mason-work itself would present to the flowing of the water. Entertaining these views, the committee would deem it necessary only to leave a sufficient amount of sluice-way through the mason-work to permit the water to subside from the flats above, after a flood, as the main stream subsides ; and for this purpose, they would consider three semicircular culverts of ·20 feet span each, sufficient.

"The committee regard the construction of the resolution, under which they act, as somewhat doubtful. They, however, believe, that it was the intention of the legislature in appointing them, merely to guard against a re-construction of that portion of the bridge in any manner that should expose the neighbouring property to greater liability to damage by floods, than during the existence of the bridge, as built in pursuance of the resolution on that subject, passed in 1825. With this view of their duty, if the bridge should be rebuilt in the manner herein above indicated, the committee would feel bound to accept it, as being, in reference to the security of the neighbouring property, in their view "equivalent" to the construction adopted under that resolution. *New-Haven, July* 5th, 1841.

*Eli W. Blake,*
*Henry Farnham,* } Committee."
*Roswell B. Mason,*

This letter was written and sent by the committee, after they had viewed, personally, the ground on which the causeway was to be repaired, and where the dry-bridge had stood, and whatever objects in the vicinity were necessary to be

seen and examined, and had maturely considered the subject ;
and it expresses truly the opinion and judgment of the com-
mittee, on the matters to which it relates.

*Hartford,*
June, 1842.

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

Some time in the month of *August*, 1841, the corporation,
under the last-mentioned resolution of the General Assembly,
commenced the repairing and rebuilding of the causeway, in
compliance with the opinions and judgment of the committee,
as expressed in their letter ; and have since completed the
repairing and rebuilding thereof, in the place formerly occu-
pied by the dry-bridge, by building it permanently of stone,
and filling up the space with sold mason-work, through the
entire length of the former dry-bridge, leaving therein four
semi-circular culverts of 20 feet span, instead of three such
culverts, as mentioned in said letter. The mason-work and
causeway so constructed, was left at least one foot and a half
lower than said dry-bridge was. And so far as the corpora-
tion have proceeded, they have complied with, and, in all re-
spects, conformed to, the opinions and judgment of the com-
mittee, as expressed in their letter, and adhered to the plan
therein prescribed.

Three fourths of the work done by the corporation in re-
building and repairing the causeway, was done prior to the
date of the bill in this case ; but they had not then com-
pleted the repairing and rebuilding the ends of the cause-
way, adjoining the dry-bridge, existing at the time when said
letter was delivered to them ; still they were proceeding to
repair and rebuild said ends in the manner prescribed by the
committee in their letter ; and it was the intention and design
of the corporation to leave said ends at least one foot and a
half lower than the dry-bridge was.

There was no evidence before the court to prove, and the
court did not find, that it was the intention of the corporation
to raise the causeway so rebuilt, in the place formerly occu-
pied by the dry-bridge, or the ends of the causeway which
adjoined the dry-bridge, so high, that either the causeway so
rebuilt, or said ends, will not be at least one foot and a half
lower than the dry-bridge was.

At the time of bringing the bill in this case, the plaintiff
owned and possessed a parcel of land, containing about four
acres, with a dwelling-house, barn, and other buildings there-
on, lying in the town of *East-Hartford, North* of, and adjoin-

Hartford,
June, 1842.

Bigelow
v.
The Hartford
Bridge Com-
pany.

ing, the causeway, leading from said bridge through the mead-ows, which is of the value of more than one thousand dollars. This piece of land the plaintiff purchased long before the corporation commenced the repairing and rebuilding of said causeway. The dwelling-house was built in the year 1820, and has remained where it now is, ever since it was built. Sometimes, during the high floods in *Connecticut* river, the plaintiff's land is covered, and his house surrounded, and filled to the depth of several feet, with the water and ice of the river. But it is not in times of ordinary floods in the river, and only in times of extraordinary floods therein, that the whole of the plaintiff's land is covered with water or ice, or that the water flows into his house. None of the plaintiff's buildings on this land have heretofore been destroyed, carried away, removed, or been in danger of being destroyed, carried away or removed, by any floods in *Connecticut* river, which have occurred, when they have been unaccompanied with ice; nor is there any danger that they will be hereafter destroyed, carried away or removed, by any floods in the river, where such floods are unaccompanied with ice; and no such danger will be produced in consequence of the rebuilding or repairing said causeway, by the corporation, as done, or contemplated to be done, by them, by any such floods, when unaccompanied with ice. But if there is any such danger, it is to be apprehended, and will arise, from such floods as are attended with ice, which will be brought upon and accumulated on the meadows, in time of such floods, and with the force with which the ice will be propelled against said buildings by the water, and which force they may not be able to resist.

There have been floods, or rises of water, in *Connecticut* river, attended with ice, when said buildings were in great danger of being destroyed, carried away and removed, by such ice; and particularly, in the month of *January*, 1841, there was such a flood, or rise of water, when there was such danger, and when one of the buildings, *viz.* the barn, standing on the plaintiff's land, was, by the water and ice, removed *Southerly*, a distance of between 16 and 17 feet. Such rises or floods, however, are very unusual and extraordinary; and there was no evidence before the court to prove, that in any other instance, any of said buildings had been removed, by water or ice; and the court was not of opinion, that in that

instance, the rise of water, or the danger to the buildings, or the removal of the barn, was caused by the existence of the causeway across the meadows, or by the dry-bridge; or that the danger would not have existed, or that the removal would not have occurred, if there had not been any such causeway or dry-bridge there. Floods, or unusual rises of water, however, have occurred more frequently and suddenly in *Connecticut* river, since the first bridge and the causeway across *East-Hartford* meadows were first built, than before the building thereof; but the court was not of opinion, that those more frequent and sudden rises were owing to, or caused by, said bridge or causeway, or any of the works of the corporation in connexion therewith.

There is *Southerly* of the causeway, a river or stream, called *Solomon's* river, which discharges itself into *Connecticut* river, below and *Southerly* of the causeway and the place where the dry-bridge formerly was; and often, in times of floods and rises, the water from *Solomon's* river flows and sets back, upon and over that portion of the *East-Hartford* meadows which lies above and below the causeway, and where the dry-bridge formerly was; (the channel and opening where the dry-bridge formerly was being the place where, and through which, the water from *Solomon's* river set back, and flowed to and upon the meadows above the causeway;) and the water sets back from *Solomon's* river, upon and flows over the meadows above and *North* of the causeway, for a considerable distance, before the waters of *Connecticut* river overflow the banks thereof, above, and *North* of, the causeway, and run down to and over the meadows above the causeway.

In the opinion of the court, the three sluices recommended by the committee in their letter, would be sufficient to allow the water to subside from the meadows above the causeway, after a flood, as the main stream subsides. The effect of repairing, rebuilding and constructing the causeway, where the dry-bridge formerly was, in the mode pointed out by the committee in their letter, and as contemplated by the *Hartford Bridge Company*, would not be, that the buildings on the plaintiff's land, or any of them, would be exposed to any greater danger of being destroyed, carried away or removed, by the water and ice, or either of them, in time of floods in

*Hartford,
June, 1842.*

Bigelow
*v.*
The Hartford
Bridge Company.

*Hartford,*
June, 1842.
———————
Bigelow
*v.*
The Hartford
Bridge Com-
pany.

*Connecticut* river, whether ordinary or extraordinary, than they were exposed to, by the causeway and dry-bridge over the meadows, as they existed before the dry-bridge was carried away. Its effect, however, in times of high floods, would be, to cause the water to rise somewhat more rapidly and suddenly, and to a somewhat greater elevation *North* of the causeway, and there to continue somewhat longer, than it otherwise would ; but to what extent precisely, it is not practicable to ascertain, by calculation, being matter of opinion and conjecture only.

From the evidence in the cause, it was not the opinion of the court, that its effect would be to cause the water to rise so much more rapidly or suddenly, or to a so much greater height, or to continue so much longer there, that the land of the plaintiff, or the buildings thereon, will be thereby injured, or lessened in value materially, or to an extent that can be appreciated or estimated. Nor would the effect of causing the water so to rise more rapidly and suddenly, or to a greater height, or to continue longer on the land, in the opinion of the court, be so great as thereby to depreciate materially the value or productiveness of the land itself; since the water would not remain so much longer upon the land as to cause any foreign substances to be deposited thereon to such a degree that the value or productiveness of the land would be materially diminished. Its effect upon the buildings on the land would be, that as the water would, as above-mentioned, rise higher, and continue in them longer, than it otherwise would, the liability of the buildings to decay and depreciation thereby, and the necessity for additional repairs, and the inconvenience occasioned to the proprietors, by such increased rise and continuance of the water, would be proportionally increased. Such decay, depreciation, repairs and inconveniences, however, in the opinion of the court, would be very small, and not capable of appreciation, and not such as would lessen materially the intrinsic value of the land or buildings.

It was further the opinion of the court, that the effect of making and leaving the causeway (which is now made in the place formerly occupied by the dry-bridge,) and the ends of the causeway which adjoin the dry-bridge, one and one half or two feet lower than the dry-bridge was, would be such as

the committee express in their letter; that when the dry-bridge was carried away, the dry-bridge, and also the ends thereof adjoining thereto, were higher than the causeway opposite the dwelling-house on the plaintiff's land; that the lowest portion of the causeway was opposite said dwelling-house; that if the causeway built in the place where the dry-bridge formerly was, and the ends of the causeway adjoining thereto, are not left depressed, in the manner recommended by the committee in their letter, there will be great danger that the dwelling-house and other buildings of the plaintiff will, in times of extraordinary floods in *Connecticut* river, and particularly, in case of such a flood as occurred therein in the month of *January*, 1841, be, by the increased rise of water, and its remaining longer on the premises of the plaintiff, materially and permanently injured and depreciated in value, and more injured and depreciated in value than they have heretofore been; and that these buildings, in times of such floods, when accompanied with ice, will be in great danger, and in greater danger than heretofore, of being swept away and destroyed by such ice.

A bill in chancery was brought by the town of *East-Hartford* against the *Hartford Bridge Company*, and said *Blake, Farnham* and *Mason*, to the superior court, holden at *Hartford*, on the 4th *Tuesday* of *September*, 1841; which was duly served on the respondents therein, on the 25th of *August*, 1841, after said company commenced rebuilding the causeway and road, as aforesaid; and the town of *East-Hartford* then applied to one of the judges of the superior court of this state, for a temporary injunction to prohibit said company, or said committee, from constructing said causeway, or authorizing, approving, or accepting it, when rebuilt and constructed, according to the manner and plan mentioned in said letter. This application was duly served on the adverse party, on said 25th day of *August*, 1841. The parties appeared before said judge, and were fully heard by him; and thereupon said temporary injunction was refused. The bill in the present case was brought subsequently thereto. The premises described in the bill of the town of *East-Hartford*, as being owned by that town, are not the same premises, which, in the present bill, are alleged to be owned by the plaintiff in this case. There has not been any improper or unreasona-

*Hartford,*
*June, 1842.*

Bigelow
*v.*
The Hartford
Bridge Company.

*Hartford,*
*June, 1842.*

*Bigelow*
*v.*
The Hartford
Bridge Com-
pany.

ble delay on the part of the plaintiff in this case, in bringing the present bill.

Upon these facts, the case was reserved for the advice and consideration of this court.

*Toucey* and *Chapman,* for the plaintiff, contended, 1. That the committee had misconstrued and exceeded their powers ; in consequence of which, the causeway had not been built according to law.   The meaning of the resolution of 1841, is, that the *Hartford Bridge Company* may construct their causeway of stone, provided they leave as much space for the free passage of water and ice as existed before—*i. e.* that there be 400 feet of sluices.

2.   That the plaintiff is entitled to the remedy sought. Here is an injury to the property of the plaintiff, affecting its value, and an inconvenience to him and the other inhabitants in the vicinity of the causeway.

In the first place, the inconvenience and discomfort suffered by the plaintiff, cannot be measured or remunerated by damages.

Secondly, if otherwise, an injunction is necessary, to prevent a multiplicity of suits.   Here is a permanent injury, not an occasional or transient one.   It is mockery to tell the plaintiff he may sue for damages as often as he is injured, when the fact is, he is injured *all the time.*

Thirdly, the court of chancery has jurisdiction to apply the preventive remedy, where persons acting under legislative authority, misconstrue and exceed their powers, and thereby produce injury to individuals, without compensation. *Gardner* v. *Newburgh,* 2 *Johns. Ch. Rep.* 162.   *Belknap* & al. v. *Belknap* & al. *Id.* 463.   *The Mohawk and Hudson Rail-road Company* v. *Artcher* & al. 6 *Paige,* 83. 88.   *Coats* v. *The Clarence Railway Company,* 1 *Russell & Mylne,* 181.   (4 *Cond. E. Ch. Rep.* 378.)   *Farnum* v. *The Blackstone Canal Corporation,* 1 *Sumner,* 46. 71, 2.

Fourthly, the relief sought in this case will be decreed, on the ground that legislative acts like these in question, are regarded in the light of contracts, made by the legislature, in behalf of every person interested in any thing to be done under them ; and a court of chancery will carry such contracts into execution specifically.   *Blakemore* v. *The Glamor-*

*ganshire Canal Navigation*, 1 *Mylne & Keene*, 154. (6 *Cond. E. Ch. Rep.* 544. 548, 9.

Hartford,
June, 1842.

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

*Parsons*, for the defendants, contended, 1. That the committee had not exceeded their powers. In the first place, the object of the resolution was, to leave sufficient openings for *back water* only. Secondly, these openings were not to be the same *in amount or space*, as formerly, but *equivalent* to former bridging: that is, they were to be equivalent for the object specified, having in view the property of adjoining proprietors. Thirdly, the sluices are to be such as, *in the opinion of the committee*, are equivalent, &c. ; and the committee having given their opinion, it must be, in the absence of fraud, (which will not be presumed,) *conclusive.*

2. That the case does not require the extraordinary interposition of the court, by injunction.

In the first place, an injunction will not be granted against *the committee.* Statutes vesting an undefined discretion in public agents to enable them to effect a great and beneficial object, ought to be benignly and liberally expounded in favour of those agents, if acting in good faith, and within the scope of their authority. If there is a reasonable doubt as to the exercise of the powers which the law confers, or where there is a *discretionary* power given and exercised, equity will not interfere. *Buonaparte* v. *The Camden and Amboy Rail-road Company, Bald.* 205. But what is decisive in this case, is, that the agents are not required to *act*, but only to *express an opinion ;* which the court finds they have done truly, in accordance with their honest judgment.

Secondly, an injunction will not be granted against the *Hartford Bridge Company.* Equity will not enjoin, unless the injury is irreparable. A mere diminution of the value of property, by a nuisance, without irreparable mischief, will not furnish any foundation for the relief sought. *Attorney General* v. *Nichol*, 16 *Vesey*, 342. *Wistanley* v. *Lee*, 2 *Swan.* 336. *Earl of Ripon* v. *Hobart*, 3 *Mylne & Keene*, 179. S. C. 1 *Coop. Sel. Ca.* 333. 2 *Sto. Eq.* 204. Here no irreparable, or even appreciable, injury has accrued to the plaintiff ; and none is threatened or justly apprehended. But one flood has occurred in forty years, that seriously endangered the plaintiff's property. A power so delicate, and to

*Hartford,*
*June, 1842.*

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

be exercised with such caution, cannot be demanded in anticipation of a contingency barely possible.

STORRS, J. This bill cannot be sustained merely on the ground that the difficulty and danger of travelling on said causeway will be increased, by the greater depth and more rapid flow of the water which will be occasioned by the contemplated acts of the *Hartford Bridge Company*, and that therefore said acts will constitute a public nuisance. It is very clear, that a bill in equity will not be entertained for an injunction against a public nuisance, unless it shows that the plaintiff will sustain a special or peculiar damage from it, an injury distinct from that done to the public at large. In *Spencer* v. *The London and Birmingham Railway Company*, 8 *Simons* 189. (11 *Cond. Eng. Ch. R.* 390.) the plaintiff averred, not only that, by the excavation of the defendants in *Granby* street, the said street was impassable, and he was deprived of access from his hackney coach and livery establishment at a place called *Granby News*, through that street to the *Hampstead* road, but also stated such facts as shewed, that he thereby suffered a particular injury, and one different from that done to individuals in general. The Vice-Chancellor, on that ground, decided, that the plaintiff had a special right, quite distinct from that of the public at large, and overruled the demurrer to the bill, which proceeded on the ground that the injury was a public nuisance, and therefore, that the relief prayed for ought to be sought by information at the suit of the attorney-general, and not by bill. In *Sampson* v. *Smith*, 8 *Simons* 272. (11 *Cond. Eng. Ch. R.* 432.) the plaintiff alleged, that the body of the smoke, which issued from the chimney of the defendant's steam engine, and the blacks and soot mingled therewith, descended in such dense bodies into the street, that the plaintiff's house and shop situated thereon, were filled therewith, and his goods and furniture very much injured, and the health and comfort of himself and family very much impaired thereby; and that it was a grievous nuisance to the plaintiff, and also to the other inhabitants of that street and neighbourhood. The bill was sustained on the ground of the special injury suffered by the plaintiff. Indeed, it is upon the ground of the particular injury to the plaintiff, distinct from that which he suffers in common with the rest

of the public, that all the applications for injunctions against what is a public nuisance are sustained. *Crowder* v. *Tinkler*, 19 *Vesey* 617. And there is no good reason why, apart from such special injury, relief should be granted in this mode, at the instance of a particular individual. Courts of equity, in this respect, proceed on the principle which prevails in courts of law, that an action will not lie in respect of a public nuisance, unless the plaintiff has sustained a particular damage from it, and one not common to the public generally. *Co. Litt.* 56 *a*. *Williams'* case, 5 *Co.* 73. Sir *Thomas Earle's* case, *Carth.* 173. 176. *Chichester* v. *Lethbridge, Willes* 71. *Robins* v. *Robins*, 1 *Salk.* 15. *Iveson* v. *Moore*, 1 *Ld. Raym.* 486. 491. *Rose* & al. v. *Miles*, 4 *Mau. & Sel.* 101. *Wilkes* v. *Hungerford Market Company*, 2 *Bing. N. Ca.* 281. *Greasly* v. *Codling* & al. 2 *Bing.* 263.

To preserve and enforce the rights of persons, as individuals, and not as members of the community at large, is the very object of all suits, both at law and in equity. The remedies which the law provides in cases where the rights of the public are affected, and especially in cases of public nuisance, are ample and appropriate ; and to them recourse should be had, when such rights are violated. The courts of equity, in *England*, will indeed entertain informations, not by individuals, but at the suit of the attorney-general, or the proper crown officer, for the purpose of abating public nuisances, and what are termed *purprestures*. That mode of proceeding has been, however, hitherto unknown here ; and whether it would be tolerated in any case, it is unnecessary to consider.

The averment, that the acts contemplated by the bridge company will be injurious to the property of others besides the plaintiff, may be disregarded ; since the bill cannot, consistently with any recognized principles, be brought on their behalf. 8 *Simons* 272.

Having disposed of these topics, the question arises, whether the plaintiff has shewn that there is such a particular and special injury meditated against him, or which he has reason to apprehend from the acts of the *Hartford Bridge Company*, that he was entitled to an injunction. And here the proof in the case relieves us from the necessity of examining minutely the principles and authorities applicable

*Hartford,*
*June*, 1842.

Bigelow
*v.*
The Hartford
Bridge Company.

*Hartford,*
*June, 1842.*

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

to bills for injunction founded on apprehended injuries, which have been so elaborately commented on, by the counsel. Of whatever character it is requisite that the injury complained of should be, in order to lay the foundation for this remedy, it is necessary that it should be a substantial, and not merely a technical, or inconsequential, injury. There must not only be a violation of the plaintiff's rights, but such a violation as is, or will be, attended with actual and serious damage. Even although the injury may be such that an action at law would lie for damages, it does not follow, that a court of equity would deem it proper to interpose, by the summary, peculiar and extraordinary remedy of injunction. 8 *Simons* 194. ⌈It is obviously not fit that the power of that court should be invoked, in this form, for every theoretical or speculative violation of one's rights.⌋ Such an exercise of it would not only be wide from the object of investing those courts with that power, but would render them engines of oppression and vexation, and bring them into merited odium. It is a power which is extraordinary in its character, and to be exercised generally only in cases of necessity, or where other remedies may be inadequate, and even then with great discretion and carefulness. It is a salutary, and indeed, a necessary power, when confined within those safe limits in which it has been exercised; but capable of being made an instrument of oppression, and therefore to be extended, if at all, with great circumspection. Earl of *Ripon* v. *Hobart*, 3 *Mylne & Keene* 169. 1 *Coop. Sel. Ca.* 333. (8 *Cond. Eng. Ch. R.* 331. 469.)

In this case, the plaintiff claims only, that his property shall be exposed to no greater danger of injury than it was before the destruction of the dry-bridge, which rendered the rebuilding of the causeway, as contemplated by the *Hartford Bridge Company*, necessary. Of the causeway, up to the time of such destruction, there is here no complaint. On this subject, it is found, that the buildings on the land of the plaintiff, by the manner in which the bridge company are rebuilding the causeway, will be in no greater danger of being destroyed or carried away, by the floods in *Connecticut* river, whether ordinary or extraordinary, than before said dry-bridge was destroyed; that, in times of high floods, the water will rise somewhat more rapidly and suddenly, and somewhat

higher, *North* of the causeway, and continue longer, than it did previous to that event ; but to what extent cannot be ascertained by calculation, and is matter of opinion and conjecture ; but not, in the opinion of the court, to such an extent as to injure the land or buildings of the plaintiff, in value, materially, or to an extent that can be appreciated or estimated ; that the productiveness of the land will not be materially diminished ; and that the decay and depreciation of the buildings, and the repairs and inconvenience that they will occasion, will be very small, and not such as will lessen materially the intrinsic value of said land or buildings.

Assuming that the nature of the injury, in this case, is such, that, if it were sufficiently important in point of magnitude, it would warrant the interposition of the court by injunction, and that the existence of the danger is shewn with such certainty that there would be no objection, on that ground, to granting the relief sought, we are clearly of opinion, without dwelling on the several particulars of the finding on this subject, that the extent of the damage to be apprehended in this case, is wholly insufficient to justify us in applying the peculiar and extraordinary remedy which is sought.  The decay and depreciation of the property, the repairs which may be thereby rendered necessary, and the inconvenience which may ensue to the plaintiff, are found to be very small, not capable of appreciation, and not such as will materially lessen the intrinsic value of the plaintiff's property.  We find no precedent, and discover no reason, to warrant the granting of an injunction for an apprehension of injury of such inconsiderable magnitude.

The plaintiff, however, relying on the principles sanctioned in *Blackmore* v. *The Glamorganshire Canal Navigation*, 1 *Mylne & Keene* 154. (6 *Cond. Eng. Ch. R.* 544.,) and the cases there cited, takes the ground that acts of the legislature, like that under which the *Hartford Bridge Company* are constructing the works in question, are, in the language of Lord *Eldon*, " to be regarded in the light of contracts made by the legislature on behalf of every person interested in the thing to be done under them ;"—that the acts, under which the said company are proceeding, form virtually a contract between the company and the neighbouring proprietors ;— that the committee, in the present case, have misconstrued

*Hartford,*
June, 1842.

Bigelow
*v.*
The Hartford
Bridge Com.
pany.

*Hartford,*
June, 1842.

Bigelow
*v.*
The Hartford
Bridge Com-
pany.

and exceeded their powers under those acts, and that the doings of the company are unauthorized;—and that, therefore, irrespective of the extent of the injury which will be inflicted on the plaintiff, they should be restrained from exceeding their powers, on the principles upon which courts of equity will proceed in enforcing the specific execution of contracts. Without questioning this view of acts of that description, it may well be doubted whether the court would, under the circumstances of this case, grant the relief here sought, if it rested on a formal contract made between the parties ; but there is no authority for believing, that the equity courts in *England* would; and certainly we are not disposed to carry the analogy which may exist, for certain purposes, between such acts of the legislature and private contracts, to the wide, inconvenient, and unnecessary extent of furnishing the relief here sought, upon the ground of such supposed analogy, in favour of every member of the community, who may experience, or have reason to fear, a trifling inconvenience or an unsubstantial injury, from a departure, perhaps merely literal, from the provisions of such acts.

The plaintiff also claims, that he is entitled to relief, on the ground that the *Hartford Bridge Company* are reducing their causeway below the height which their charter permits, and that they may be compelled to raise it to the height which it requires ; in which case, as the court finds, the water will, with the reduced amount of sluiceway, be so raised as to expose the buildings of the plaintiff to great injury and destruction. It is not, however, found, that the company have depressed the causeway below what the charter warrants ; and if they had, and should be compelled to raise it, it is not to be presumed that they would, in that case, neglect to enlarge the outlet for the increased accumulation of water. The state of things which the plaintiff here supposes and apprehends, is not found to be meditated by the company ; and it is proper to wait until it actually exists, or is threatened, before the requisite remedy shall be applied.

This view of the case supersedes the necessity of enquiring what is the true construction to be put on the resolution of the legislature of 1841, which is not unattended with difficulty ; or whether the committee appointed by that resolution are properly made parties to this bill.

The superior court, for these reasons, should be advised that the bill ought to be dismissed.

Bigelow
*v.*
The Hartford
Bridge Company.

In this opinion the other Judges concurred, except WILLIAMS, Ch. J., who gave no opinion, being disqualified by interest in the event of the suit.

**Bill dismissed.**