GEORGE H. CLEVELAND

*v.*

FRANKLIN H. MARTIN.

*Opinion filed October 24, 1905—Rehearing denied Dec. 7, 1905.*

1. INJUNCTION—*when an injunction should not be granted.* An injunction to restrain a publisher from marketing a medical work written by complainant, upon the alleged ground that the mechanical inferiority of the book will bring ridicule upon the complainant and injure his professional reputation, should not be granted where the proof leaves the terms of the contract as to the mechanical work uncertain and fails to show that complainant will suffer any injury, whereas the defendant's damages will exceed any benefit which complainant might derive from granting the injunction.

2. SAME—*a breach of contract will not be enjoined unless contract could have been specifically enforced.* A breach of contract will not be enjoined by a court of equity where the terms of the contract are so uncertain that it could not have been specifically enforced had the complainant chosen such remedy.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

This is a bill, filed on November 13, 1903, in the Superior Court of Cook county by the appellee against the appellant to enjoin the appellant and his agents and employes from selling, giving away, delivering or exhibiting to any person or corporation whatsoever any copy of a medical work, en-

titled "A Treatise on Gynecology," of which appellee, who is a physician, is the author, and of which the appellant, who was also a physician—though not practicing, as he is engaged in publishing medical works—had undertaken the publication. The bill alleges, in substance, that the appellant had not published the book in such form as the parties had agreed upon; that is to say, it is alleged that there was a breach of the contract, and the bill is filed to restrain such breach. An answer was filed to the bill by the appellant, and replication was filed to the answer. On December 4, 1903, the court rendered a decree substantially denying the relief prayed for. An appeal was taken from this decree to the Appellate Court. The Appellate Court reversed the decree of the Superior Court, and remanded the cause to the latter court, "with directions to that court to enter a decree according to the prayer of the bill." The present appeal is prosecuted from such judgment of reversal with directions, so entered by the Appellate Court.

The bill alleges that the complainant, appellee herein, is a physician, and had for a number of years made a specialty of operative gynecology; that he had for many years been secretary of the medical faculty of the Post-Graduate Medical School of Chicago; that as such he had lectured on the subject of gynecology before a large number of medical practitioners throughout the western States, who attended said school for post-graduate instruction; that he gave clinics before said students, and other students of medicine at several medical institutions in Chicago; that his experience had been such as to render probable a demand for any production from him on that subject; that early in 1903 the appellant, doing business under the name of the "Cleveland Press," desired to publish in book form a series of lectures then about to be delivered by appellee at said school on said subject; that it was agreed between appellee and appellant that the latter should produce said lectures in book form, using finished paper and making the same thoroughly well

bound; that appellee was to furnish manuscript and drawings, and appellant was to make the necessary plates and furnish all the material for the production of a first-class book to be sold by appellant; that afterwards it was agreed between them that a text book, covering the entire field of gynecology, should be prepared, appellee furnishing manuscripts and drawings, and appellant making the necessary plates and furnishing the material necessary for the issuance of a first-class book; that it was stated by appellant that the book should, in the matter of workmanship, compare favorably with the text book of Howard A. Kelly, M. D., on Operative Gynecology, a standard authority published in 1898 by D. Appleton & Co., of New York; that appellant "should print, bind, offer for sale, and extensively advertise, an edition of two thousand copies thereof, and quarterly report to Martin the sale of such books; that Martin was to receive no royalty on the first edition of two thousand volumes, but in lieu of royalty was to receive a certain number of copies of said text book, and after the edition of two thousand volumes had been printed, the interest of Cleveland in said text book was to cease;" that appellee furnished the manuscript and drawings necessary; that the appellant had plates made from the drawings, and caused the manuscript to be set in type and printed; that appellant caused an announcement of the publication to be made in various medical journals, and appellee, with appellant's consent and at his own expense, caused to be printed ten thousand copies of a certain chapter of said text book together with the illustrations thereof, which were distributed at the appellee's expense among practicing physicians and surgeons in Illinois and other States; that on the back of the re-print was printed the advertisement of appellant, and by means thereof a large number of orders were received at the sum of $5.00 per copy; that on November 10, 1903, a copy of said text book, entitled "A Treatise on Gynecology," was delivered at appellee's office by appellant; that said book was

printed on inferior paper from inferior type; that a very low grade of ink was used; that the plates, made from the drawings prepared under appellee's directions at an expense to him of nearly $1000.00, are inferior in every respect and printed on inferior paper; that the binding is very crude and inferior in every respect; that said book in its workmanship as a whole is wholly inferior to Kelly's book; that appellant has already delivered a number of said books to persons, who had ordered them, and is about to deliver others and to send copies to medical book reviewers; "that the mechanical crudeness of the book will excite unfavorable criticism and subject Martin to ridicule and prevent the successful marketing of the book;" that the advertisements expressly stated that the letter-press, paper and binding were of the highest class; that appellee was frequently called into consultation in special cases by physicians and surgeons, residing and practicing in other cities; that such persons will be among the first to procure copies of said book, and, finding themselves defrauded by appellant's misrepresentations, will conceive a hostility towards appellee, supposing him to be responsible for the foisting of so crude a production; that physicians and surgeons generally, who may order said work, will entertain towards appellee a feeling of hostility; that such persons will in the future refrain from calling appellee into consultation to his great loss and injury, to remedy which the law is wholly inadequate; that appellee has spent $1500.00 in the preparation of said text book and drawings, together with great labor extending over a period of about ten months; that the only compensation he was to receive from appellant in exchange for permission to publish and sell two thousand copies of said book, was that appellant should issue a book, first-class in every respect, and extensively advertise it, so as to create a demand therefor, whereby appellee might sell subsequent editions at large profit to himself; but that the book as issued is so inferior that, if appellant is permitted to place it upon the market, purchas-

ers thereof will be imposed upon and will speak harshly of Martin and his book; that the appellant, without appellee's knowledge and consent, has procured a copyright on said volume in his own name.

The prayer of the bill, in addition to such portion of the same as is above set forth, asks that Cleveland and his assigns and agents may be compelled to return to the persons, who have already purchased the said volumes, the several amounts paid by them therefor, and, so far as possible, secure from them the return of said book; that they may be directed to turn over to Martin all the plates, electrotypes, drawings, etc., used in the publication of said volume; that they may be decreed to assign to Martin the aforesaid copyright, and for general relief.

The answer of appellant states that he was approached by appellee with reference to said publication, and admits that he was to publish the same in first-class form, and for which appellee was to furnish the manuscript and drawings, and appellant was to have made the necessary plates, and furnish all the material for the production of such text book. The answer admits that it was afterwards agreed between appellant and appellee that a text book, covering the entire field of gynecology, should be prepared, appellee to undertake to furnish the manuscript and drawings, and appellant to have made the necessary plates and to furnish the material necessary for the publication of the book in first-class form; that appellant "should print, bind, offer for sale and extensively advertise an edition of two thousand copies of said work, and that Martin should receive no royalty for the first edition of two thousand volumes of said text book, but in lieu of royalty he should receive twenty-five printed and bound copies of such text book, and that after said edition of two thousand volumes had been printed and sold, the interest of said Cleveland in said text book should cease." But the answer denies that the appellant made any agreement or representations regarding the paper to be used in said book,

except that a finished paper be used, and that the book be thoroughly well bound; denies that the book, to be printed by appellant, should in every respect compare with Kelly's book; admits that appellee furnished the manuscript and drawings and appellant had plates made therefrom and caused the manuscript to be set to type and printed, and that appellant and appellee caused announcement to be made of the forthcoming publication. The answer denies that the book was printed on inferior paper, or that a low grade of ink was used, or that the plates were of an inferior kind, or were printed on inferior paper, or that the binding of the book was crude and inferior; but alleges that said book was printed and bound in first-class manner, and compares favorably with books in general published for distribution and sale throughout the medical profession; also denies that the mechanical part of the book will excite any unfavorable criticism of appellee, or subject him to ridicule, or prevent the successful marketing of the book, or that any hostility will be created towards appellee by the publication of the same; alleges that appellant has performed his part of the contract and published the book in first-class manner, and that the publication of the same will cause no hostile criticism of appellee, and lead to no injury to his professional reputation, and will in nowise injure the sale of said book or damage him; denies that he procured a copyright without appellee's consent and knowledge, but avers that, with appellee's knowledge and consent, he procured the copyright thereof to be assigned to appellee whenever appellant's rights in the subject matter of said copyright were at an end, and appellant disclaims all permanent and enduring title to said copyright.

The decree of the Superior Court found that the appellee had not maintained the allegations of the bill, so as to entitle him to have the injunction theretofore issued in the case made perpetual, and accordingly the interlocutory injunction, which had been issued, was dissolved. The decree of

the court found that the right of appellant to print, publish and market the book was limited, and was a right to print, publish and market an edition of said book to the number of two thousand, and no more, and that the whole of said edition had been printed, but had not been marketed. The decree also found that there was an agreement between the appellee and appellant, whereby the latter was granted the exclusive right to print, publish and sell the "Treatise on Gynecology" for a period of one year from the day of the first publication of said book, to-wit, from November 10, 1903, provided appellant should not print, publish or sell, or otherwise distribute more than two thousand copies thereof, including twenty-five copies to be given to complainant; that, in pursuance of such agreement, a copyright of said "Treatise on Gynecology" was applied for and procured by the appellant in the name of "Cleveland Press," and that appellant is entitled to the protection, which such copyright affords only so far as the first edition of said book to the number of two thousand copies thereof is concerned, and that for all other purposes such copyright belongs to the appellee; and it is ordered and adjudged therein that appellant be perpetually enjoined from printing, or causing to be printed, any more copies of said treatise, and from selling, giving away, or in anywise distributing, any more copies thereof than the two thousand copies already in print; that appellant forthwith assign to appellee the copyright of said treatise, provided that such assignment shall not inure to the benefit of appellee, so as to permit him to print, publish or sell, or cause to be printed, published or sold any edition of said treatise, or copies thereof, until on and after November 10, 1904; and that appellee recover the costs of the proceeding.

SCHMITT & WISE, for appellant.

FRANK CROZIER, for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The appellee is a physician and a medical lecturer, whose specialty is operative gynecology. The proof shows that he is a man of high standing in his profession, or that particular branch of it, to which he is devoted. He first on January 27, 1903, made an agreement with the appellant, a publisher of medical books, to publish certain medical lectures to be delivered by himself "in first-class form, using a finished paper thoroughly well bound, and placed through our traveling representatives and the trade;" in lieu of royalty the appellant to furnish appellee twenty-five copies of said book *gratis,* and to have all plates made, and to return to the appellee the original drawings if he should desire, but manuscript and drawings to be furnished with reasonable promptness and the work completed on the part of appellee before August 1, 1903; appellee to agree, in protection of appellant, not to write a work for another publisher upon the same, or similar subject, within a period of at least a year from date of publication of the work in appellant's hands; and it was understood that the appellant was to make a quarterly report to appellee of the number of sales made, the first installment to be sent by appellee on February 4, 1903. Subsequently, in April, May or June, 1903, it was agreed that, instead of the lectures, a text book, covering the entire field of gynecology, should be prepared; and, by the terms of this subsequent agreement, appellee undertook to furnish the manuscript and drawings for the book, and appellant undertook to have made the necessary plates, and to furnish the material necessary for the publication of the book in first-class form. Appellant was to print, bind, offer for sale and extensively advertise an edition of two thousand copies of the work, and appellee was to receive no royalty on the first edition of two thousand copies of the book, but, in lieu of royalty, was to receive twenty-five printed and bound copies

of said text book, and, after such two thousand copies of said book had been printed and sold, the interest of Cleveland in said text book should cease.

The proof shows that the appellant has printed, bound and is offering for sale the two thousand copies of said text book, as above mentioned. The proof also shows that he has already sold one hundred and twenty copies of said book. The first copy of the text book, seen by the appellee, was delivered to him on November 10, 1903, and appellee at once objected to the book as not being the kind of book which the contract, as he interpreted the contract, called for. It is not shown that appellee received the whole of the twenty-five copies, which he was to receive, but it is not shown that the appellant has not been willing at any time to deliver to him the whole number of the copies, which he was to receive. The object of the present bill was to enjoin the appellant from selling or disposing of any more of the first edition of two thousand copies than the one hundred and twenty copies already sold by him.

*First*—It is said by counsel for appellee all through his argument that the object of the present bill is to enjoin a breach by appellant of the contract between appellant and the appellee. It is to be observed, however, that the contract has already been partially performed. That is to say, as we understand the evidence, the two thousand copies have been printed and bound and offered for sale, and one hundred and twenty thereof have actually been sold. The object of the injunction is to prevent the sale of any more of said first edition of two thousand copies.

The evidence does not show clearly and definitely the terms of the contract between appellee and appellant. A certain Dr. Kelly had written and published a work on Operative Gynecology, which is shown by the proof to have been a standard authority, and to have been a first-class and well-bound publication. Appellee contends that appellant agreed to publish appellee's work on gynecology, so that it

218—6

would compare favorably with Kelly's book on the same subject, so far as mechanical execution was concerned. Appellant denies that he agreed to any such thing. A young lady, who acted as secretary for appellee, states substantially that appellant was to make the book, written by appellee, of the same character as Kelly's book. She states that, when appellant was present at one time in the office, appellee took down from one of the shelves of his library Kelly's book and showed it to appellant, and that appellant then stated that his publication would be equal to the Kelly book. Appellee's evidence, however, tends strongly to show that the book, taken down from the shelf of the library and shown to the appellant upon the occasion mentioned, was not Kelly's book, but was a book written by Dr. Davis, which has been introduced as an exhibit in this cause. As appellant and appellee contradict each other as to any agreement to make the new publication equal to the Kelly book, and as the secretary's evidence is not a conclusive confirmation of appellee's statement upon the subject, the mind is left in doubt whether or not there was any agreement that a book, equal to Kelly's book, should be published by appellant.

Appellant, however, admits that the book to be printed for appellee was to be published in first-class form, and that finished paper should be used, and that it was to be thoroughly well bound. The testimony of appellee tends to show that the book, as published by appellant, was not of the first-class character thus agreed upon, while the testimony of appellant tends to show that it was such a book as the agreement, actually made, called for. It will be impossible for us within the limits of this opinion to analyze all the testimony upon this subject. Besides the testimony of himself and his secretary, appellee produced only two witnesses, who swore that the book, printed by appellant, was not a first-class publication. The witnesses thus testifying were expert bookmakers, but not special publishers of medical books. Their testimony relates chiefly to alleged defects in appellant's pub-

lication, which would be apparent to expert bookmakers, but would not necessarily be apparent to the ordinary reader, medical or otherwise. On the contrary, the appellant, besides his own testimony, produced four witnesses, who swore substantially that the book was well and neatly bound, and that it was better than the average medical scientific book of that character, selling at that price, to-wit, $5.00 a volume. Two of these witnesses were physicians, who had practiced as such for many years; one of them had been engaged in the city of Chicago for thirty years in the selling and publishing of medical books, and the other was an experienced bookbinder. If the testimony of the four witnesses, thus produced by appellant, be true, then the publication in question came up, in character and quality, to the requirements of the contract between the parties, so far as its mere mechanical execution was concerned. We do not feel called upon to determine whether the statements, made by the witnesses produced by the appellant, are to be taken as correct. It is sufficient to say that the testimony leaves it uncertain as to what the real terms of the contract were.

*Second*—It is clear to our minds from the evidence that the appellee could and did suffer no injury from what is alleged by him to have been a breach of the contract. As to the first edition of two thousand volumes, appellee admits that he was to receive no royalty, but only twenty-five copies of the book. If the contract had been that he was to receive a certain proportion of the money realized from the sale of the first edition, then his damages, if any, could be easily ascertained. If the appellant printed and published a book, which was not such a first-class book as the contract called for, it might be possible to determine how much less per volume such a book would sell for than a book, which did come up to the requirements of the contract. It appears in evidence in this case that Kelly's book sold for $7.00 or $8.00 per volume, and was admitted to be a first-class publication; and that it did sell for $7.00 or $8.00 per volume was known

to the appellee. It was agreed between appellant and appellee that the book, here in controversy, should be sold for $5.00 per volume, and it is difficult to understand how it could have been expected that it would be equal in character to the Kelly book.

But appellee claims that the only consideration, which he expected to receive from the sale of the first two thousand copies by the appellant, was the increase and extension of his reputation as a physician. He says that he was called into consultations with other physicians, and he supposed that, if this first edition was put upon the market and sold, it would increase his practice by increasing the number of calls for the exercise of his professional skill. The only injury, which, as he says in his testimony, was expected to result to him from the publication and sale of this book by the appellant, was that he would be brought into ridicule among his professional brethren, and be subjected to criticism by them for putting forth and permitting to be sold such a publication as that issued by the appellant. The testimony is clear and overwhelming to the effect that he did not suffer and could not have suffered any injury in this respect.

Dr. Nathan S. Davis, who had been a practicing physician for more than sixty-six years, states in regard to the present book as follows: "The general aspect of it is just about the same as the average of publications from good publishing houses; * * * I do not see how there could be any harm done to the reputation of Dr. Martin by the circulation of this book in this form, assuming the text of the book to be scientifically excellent and valuable; * * * witness knows Dr. Martin, and, so far as he knows, Dr. Martin's reputation as a physician is good.—Q. And now that you have viewed this book and examined it here in court, have you conceived any less good opinion of Dr. Martin's attainments as a physician?—A. Why, certainly not. If the text is all right, I have not read it, if it is all right I

should consider it a credit." William T. Keener, one of the witnesses above named, publisher and seller of medical books, states in his evidence that he had copies of the Martin book at his store for sale, and that he had sent out about ten copies of the same, which he had previously sold, and had not heard anything one way or the other from the purchasers; after stating that the book was better than the average, the following appears in the testimony of this witness: "Q. Well, supposing the book to be sold, and the book to be excellent, what effect would the cheap appearance of the book, if it was sold, have upon the doctor who wrote it?—A. I should think it would help him. No one would hold the doctor responsible, as a rule, for the mechanical appearance of it. * * * The binding of the Martin book, for its class, is of the highest class; it is very good; better than the average."

Dr. Joseph M. Patton, who practiced medicine in Chicago for twenty years and was acquainted with the reputation of the appellee, which, as he stated, was good, says that, from his examination of the Martin book, it compared with medical books generally very favorably; and he further says: "Do not know of any damage that might result to Martin's reputation from the distribution of his book by reason of any mechanical imperfections, provided that the text is scholarly and correct. The average physician in buying a book considers first, its contents; secondly, its author; third, the quality of the paper, and readability, and general appearance. A doctor would most decidedly be less governed by the mechanical part of a book than by the text, if he knew what he wanted; assuming that complainant has an excellent reputation and high standing as a gynecologist, and, assuming that the text of the book bore out that reputation, witness cannot conceive of any way in which the distribution of the book would cause hostility toward him, or in any way damage his professional reputation or character;—Q. So that in your opinion if this book should go into

general circulation, and its text should prove to be scientifically correct, and of a high standard of excellence, you, as a doctor of long standing, would say that the book—that the distribution of the book would tend rather to increase than to prejudice his reputation—is that true?—A. I should, most assuredly. * * * Witness has sufficient knowledge of medical books to state that the Martin book is a book up to the average medical scientific book of that character for that price."

The only damage or injury, which the appellee refers to in his testimony as likely to result to him from a sale of the book in question, is merely a supposed criticism upon his professional attainments. As the testimony is clear and conclusive, that the circulation of the book would not thus injure in any way his professional standing, then, so far as this record shows, there is no injury or damage, which has been or could be established by proof. Indeed, the appellee himself impliedly admits that his reputation would not thus be injured by the following statement in his testimony, to-wit: "Is not sure that the book as published would destroy any reputation already gained, but is certain that it would not help such reputation." He also says in another part of his testimony that the amount of the damage, which he would suffer, would be "purely speculative."

*Third*—What is the law applicable to the state of facts above set forth? In the American and English Encyclopedia of Law (2d ed. vol. 16, p. 360), it is said: "To entitle a person to injunctive relief he must establish as against the defendant an actual and substantial injury, and not merely a technical and inconsequential wrong entitling him to nominal damages only. * * * To warrant the allowance of a writ of injunction it must clearly appear that some act has been done, or is threatened, which will produce irreparable injury to the party asking an injunction."

High in his work on Injunctions, (3d ed. vol. 1, secs. 9, 22) says: "Substantial and positive injury must always

be made to appear to the satisfaction of a court of equity before it will grant an injunction, and acts which, though irregular and unauthorized, can have no injurious result, constitute no ground for the relief. * * * An injunction, being the 'strong arm of equity,' should never be granted except in a clear case of irreparable injury, and with a full conviction on the part of the court of its urgent necessity." (See also *Citizens' Coach Co.* v. *Camden Horse Railroad Co.* 29 N. J. Eq. 299; *Bigelow* v. *Hartford Bridge Co.* 14 Conn. 565; *Whittlesey* v. *Hartford Railroad Co.* 23 id. 433). In *Bigelow* v. *Hartford Bridge Co. supra,* it was held that "to authorize a court of equity to interpose its power by the summary, peculiar and extraordinary remedy of injunction, there must be not only a violation of the plaintiff's right, but such a violation as is or will be attended with substantial and serious damage."

It has been said that "an injury is irreparable either from its own nature, as when the party injured cannot be adequately compensated therefor in damages, or when the damages which may result therefrom cannot be measured by any certain pecuniary standard, or when it is shown the party who must respond is insolvent, and for that reason incapable of responding in damages." (*Lloyd* v. *Catlin Coal Co.* 210 Ill. 460). In the present case, it is shown that no such damages will result to appellee or to his reputation as a physician as he anticipates. In other words, it does not appear here that he will in any way suffer "an actual and substantial injury." It not only does not appear that he will suffer any irreparable injury within the meaning of the definition above given, but it does not appear that he will suffer any injury at all. Whatever acts on the part of appellant have been shown here to be irregular or unauthorized, if any, can have no injurious result, and, therefore, they constitute no ground for the relief asked for.

*Fourth*—While it is true that, in the exercise of its jurisdiction by injunction to restrain the violation of contract,

equity is not governed by considerations of relative conveni-
ence and inconvenience of the parties, likely to result from
granting or withholding the relief, yet when the terms of the
contract, insisted upon by the complainant, are not clear and
free from doubt, and where the complainant's right to an
injunction, as is true in this case, is not entirely clear, but is
involved in doubt, and where the injury alleged to be a con-
sequence of a breach of the contract is remote and prob-
lematical and speculative, or, as is the case here, not at all
probable or even possible, then, "it is the duty of the court
to consider the inconvenience and damage that will result to
the defendant, as well as the benefit to accrue to the com-
plainant by the granting of the writ, and where the defend-
ant's damages and injuries will be greater by granting the
writ, than will be the complainant's benefit by granting the
writ, or greater than will be complainant's damages by the
refusal of it, the court will, in the exercise of a sound discre-
tion, refuse the writ." (*Lloyd* v. *Catlin Coal Co.* 210 Ill.
460). In other words, the rule, that, in the exercise of its
jurisdiction by injunction to restrain the violation of con-
tracts, equity is not governed by considerations of the rela-
tive convenience or inconvenience to the parties likely to
result from granting or withholding the relief, "is to be ac-
cepted with the qualification that considerations of the rela-
tive convenience and inconvenience to the parties are rejected
only when the covenants themselves are clear and free from
doubt, and their violation is clearly established, and where
irreparable injury is likely to result unless the breach is re-
strained. But, if these conditions do not co-exist, the ques-
tion to be determined is one of comparative injury, and the
court will be governed by considerations of the relative in-
convenience likely to result to the parties from granting or
refusing the relief. And upon an application for an inter-
locutory injunction to restrain a breach of covenant, if the
question is involved in doubt, the burden rests upon the
party complaining to show that the balance of convenience

is in favor of granting the injunction." (2 High on Injunctions,—3d ed.—sec. 1136).

In the case at bar, it is apparent that the appellant will suffer considerable damage from the granting of the injunction, while no benefit will result to the appellee from the granting of it, and no damage will be caused to his interests by the refusal of it. Two thousand copies of the book have been printed and bound and are ready for sale. The printing and binding of them has been an expense to the appellant, and, if he is not allowed to dispose of them, all his work will be lost. A court of equity will take this view of the case into consideration in determining the question whether or not the injunction ought to be granted. It is evident that the question here to be determined is one of comparative injury, and, in view of the uncertain and indefinite nature of the contract, the relative convenience and inconvenience of granting an injunction to the parties interested should be considered. It is to be noted in this connection that none of the one hundred and twenty copies of the book, which have been sold by appellant, have been returned, and no complaint has been made of them or of any one of them by any purchaser or purchasers thereof.

It has been said that "an injunction, restraining the breach of a contract, is a negative specific enforcement of that contract. The jurisdiction of equity to grant such injunction is substantially coincident with its jurisdiction to compel a specific performance. Both are governed by the same doctrine and rules. It may be stated, as a general proposition, that, whenever the contract is one of a class which will be affirmatively specifically enforced, a court of equity will restrain its breach by injunction, if this is the only practical mode of enforcement which its terms permit. It is plain that, as a general rule, to enjoin one from doing something in violation of his contract is an indirect mode of enforcing the affirmative provisions of such contract, although such an injunction may often fall short of accom-

plishing its object." (3 Pomeroy's Eq. Jur. sec. 1341; *Welty* v. *Jacobs,* 171 Ill. 624; *Chicago,Municipal Gas Light Co.* v. *Town of Lake,* 130 id. 42). In the case at bar, there could be no specific performance of this contract enforced. Appellant could not be compelled by injunction to print and bind two thousand copies of the book in question, so as to make such copies of a higher and better grade than those already printed and bound. In addition to this, it is also a matter of sound legal discretion with a court of equity whether or not it will enforce the specific performance of a contract. The court will only interpose by injunction "in cases where the subject of it is clear, definite and certain." (*Howell Co.* v. *Pope Glucose Co.* 171 Ill. 350). In his work on Injunctions (3d ed. vol. 2, sec. 1137), Mr. High says: "Certainty is an essential element in the contract, whose enforcement is sought by injunction, and where a covenant is indefinite and uncertain in its provisions no injunction will be allowed." In the case at bar, the terms of the contract are in dispute, and it is impossible for a court of equity to say from the evidence what kind of a book was to have been made.

Even if it be admitted that the book in question was to be a first-class book, it cannot be determined definitely what character of book a first-class book of the kind, here to be published, is.

In *Mackovsky* v. *Manhattan Railroad Co.* 11 N. Y. 649, where a contract used the term "first-class funeral," it was held that such a term, "when applied to a particular individual, generally has reference to the previous social status and pecuniary condition of the person to be interred; for what might be considered extravagant in one case would be seemingly moderate in another." So, here, what might be considered a "first-class" book to adorn the library of a literary man might not be first-class when it was to be used by a doctor in his every-day work. The term, "first-class," is relative in its meaning, and depends upon the use to be made of the book and upon the character of the persons

who are to use it. In *Vought* v. *Williams,* 120 N. Y. 253, a vendee in a contract to purchase real estate stipulated that the title should be "first-class," and it was held that the words there could mean nothing more than that the title should be "marketable." If the term, "first-class," as applied to the publication here under consideration, be regarded as meaning "marketable," all the proof in the record tends to show that the publication in question was marketable, and that the defects charged against it by the appellee in this case did not render it unmarketable. Courts of equity will not always enforce the specific performance of a contract, unless the contract is reasonably certain as to its subject matter, its stipulations, its purposes, its parties and the circumstances under which it was made. (*Clipson* v. *Villars,* 151 Ill. 165; 2 Beach on Modern Eq. Jur. sec. 584). "The terms of the contract must be distinctly alleged so as to leave none of its essential details in doubt or uncertainty. So, in like manner, the proof is required to be clear, definite and satisfactory." (Ibid).

For the reasons above stated, the judgment of the Appellate Court is reversed and the decree of the superior court of Cook county is affirmed, except in so far as it finds that there was "an agreement between complainant and defendant whereby the defendant was granted the exclusive right to print, publish and sell the 'Treatise on Gynecology' for a period of one year from the day of the first publication of said book, to-wit, from November 10, 1903, provided defendant should not print, publish, or sell, or otherwise distribute more than two thousand copies thereof, including twenty-five copies to be given to complainant." There is no evidence in the record, so far as we have been able to discover, which justifies any such finding as the one thus made by the superior court.          *Judgment reversed.*