## The Buck Mountain Coal Company *versus* The Lehigh Coal and Navigation Company.

*Equity.*—*Bill to enforce performance of public duties by a corporation, not maintainable at suit of private party.*

1. A bill in equity to enforce the performance of public duties by a corporation, cannot be maintained by a private party in the absence of a special right or authority.

2. Therefore, where the slackwater navigation of the Lehigh Coal and Navigation Company, with dams, locks, and other devices, were damaged, broken, and swept away by the flood of the 4th of June 1862, it was *held*, that a bill in equity could not be maintained by another company, to enjoin the respondents from neglecting to repair and put in operation their navigation; and that complainants had no right to a decree compensating them for any damages suffered as incident to the non-repair.

3. *Semble*, that a bill for an injunction, sued out on the part of the Commonwealth by the attorney-general, would lie against the respondents, to compel them to observe their charter obligations.

CERTIFIED from the Court at *Nisi Prius*.

This was a proceeding founded on a bill in equity, filed January 3d 1863, by The Buck Mountain Coal Company against The Lehigh Coal and Navigation Company, in which the complainants set forth that they were incorporated by an Act of the General Assembly of the Commonwealth of Pennsylvania, approved the 16th day of June, A. D. 1836, for the purpose of mining coal, and for transacting the usual business of companies engaged in the mining, transporting to market, and selling of coal and the other products of coal-mines; and were subsequently authorized to construct a railroad with one or more tracks to intersect the navigation of the defendants.

That on the 13th February, A. D. 1822, the defendants were incorporated and authorized by their act of incorporation to improve the navigation of the Lehigh river from the Great Falls to its mouth, and for this purpose the river Lehigh was divided into two grand sections. That the duties and obligations were by the same act imposed on them of completing their works within twenty years from the 20th day of March 1818, and of thereafter keeping every dam, lock, and sluice of their construction in good order and repair, and the said river freed from all obstacle and obstruction, so that boats, arks, &c., might safely navigate the same; and that under said charter the defendants completed their works within the time limited, and have ever since and up to June 1862 kept the same in good order and repair.

That complainants, shortly after their incorporation, bought certain coal-lands in Luzerne county, within four miles of the mouth of Laurel Run, a stream emptying into the Lehigh river, within the second section of defendants' works. That after com-

plainants had been authorized to connect with defendants' navigation, which was then approaching completion, they purchased of defendants · (intermediately through some of their corporators) a tract of land bounding on defendants' works at the mouth of Laurel Run, with certain rights of way and privileges, with the intent, as then communicated to and known by defendants, of building a railroad from their mines, and establishing at the mouth of Laurel Run a depot for the receipt, preparation, and shipment to market by the works of defendants of coal to be raised from complainants' mines. That this purchase was made by complainants in the full faith and confidence that the defendants would comply with their charter obligations, and continue to keep their works in good order and repair. That complainants expended in the construction of a railroad from their mines to defendants' navigation, at the mouth of Laurel Run, the sum of $80,289.42, and in the construction of a coal-breaker and other necessary works, $51,483.60, and in or about the year 1840, they commenced transporting coal from their mines to said depot at Rockport, where they broke and prepared their coal, and thence shipped it by the navigation of defendants to market. That they continued so doing until about the month of June 1862, and paid tolls for their coal so shipped by the works of defendants from 1840 to 1862, to an amount exceeding $650,000 ; and that during all that time the navigation of the defendants afforded the only outlet for the coal mined on complainants' lands to market. That on or about the 4th day of June 1862, a heavy freshet occurred in the river Lehigh, by means whereof the navigation of the said defendants, and the dams, locks, and other devices whereby the same was maintained were damaged, broken, and partially swept away, so that boats could not run on the said navigation, by means whereof the complainants were prevented from transporting their coal to market.

That complainants hoped and defendants pretended that the latter would proceed without unnecessary delay to place their works in good order and repair, or supply their place by a railroad, and that they did in fact repair their navigation to Mauch Chunk, the upper end of the first grand section of their works, and so obtained an outlet for coal mined on defendants' own lands in that vicinity, but that they have neglected and refused, and still neglect and refuse to repair the upper grand section, so obtaining for the time being the monopoly of the Lehigh coal trade for their own coal, as far as concerned all other owners of coal-land who had theretofore depended on the navigation for transit to market. That on the 11th day of December 1862, complainants having then been informed that the defendants did not intend to repair the upper grand section of their works, addressed to defendants a written communication asking whether they intended

[Buck Mountain Coal Co. *v.* Lehigh Coal and Nav. Co.]

to restore the navigation on their upper section as far as Rockport, and if so, when, and if not, whether they were ready to indemnify complainants for their losses, sustained by defendants' neglect? To which communication defendants returned an evasive answer. That complainants' loss in the business of 1862, by reason of being cut off from their outlet to market, was over $50,000, and their loss on the depreciation in value of their locomotive and cars about $8080. Complainants further showed that their railroad to and the works at Rockport will be rendered entirely valueless if defendants persist in neglecting to repair the upper grand section of their navigation. The bill further set forth the refusal of defendants to repair their works, or compensate complainants for their loss, and prays for specific relief as follows:—

"That the said The Lehigh Coal and Navigation Company may be strictly enjoined and commanded, until final hearing and thereafter perpetually, that they cease neglecting to put and keep in good order and repair the dams, locks, and other devices necessary to complete their navigation of the river Lehigh, from Mauch Chunk to the mouth of Laurel Run, in as good and complete order and condition as the same was prior to the 4th day of June, A. D. 1862. And that an account be taken of the amount of the loss that has accrued to the complainants in their business by reason of the neglect of the said The Lehigh Coal and Navigation Company to put and keep in good order and repair the upper grand section of their navigation since the said 4th of June, A. D. 1862, and that the same may be ordered and decreed to be paid by defendants to complainants. And that an account be taken of the cost of the complainants' railroad from their coal-lands to Rockport, and of their works and property at or near Rockport, and of the cars and locomotives heretofore used or procured for use on their said railroad and now owned by them, and of the depreciation in value thereof that has occurred on account or by reason of the defendants' neglect as aforesaid, or on account or by reason of any other arrangements that complainants have been compelled to make, by reason of such neglect, to secure an outlet to market for their coal to be hereafter sold, and that defendants may be ordered and decreed to make full compensation to complainants for such loss on the basis of such an account so to be taken, and in the amount of such loss so found."

There was also an alternative prayer for relief, founded on the allegation in the bill that by reason of the neglect of defendants as aforesaid, they have been enabled to make and divide profits arising from their works and coal-lands, since the said injury to their works, to a large amount, and that such profits should have been applied towards the payment of the loss suffered by complainants by reason of such neglect. This alternative prayer was as follows:—

[Buck Mountain Coal Co. *v.* Lehigh Coal and Nav. Co.]

" Or that an account be taken of the amount of profits made by the said The Lehigh Coal and Navigation Company since the 4th day of June, A. D. 1862, and of the amount it would have cost the said The Lehigh Coal and Navigation Company to have immediately, after the 4th day of June, A. D. 1862, put in good order and repair the dams, locks, and other devices necessary to make their navigation from Mauch Chunk to Rockport at the mouth of Laurel Run, as good and available for the running of boats as it had been prior to the said 4th day of June, A. D. 1862; and that out of such amounts the said defendants be ordered and decreed to pay unto complainants the amount of loss of business for the year 1862, caused or occasioned by defendants' neglect to put their said navigation in such good order and repair as aforesaid, together with the full value of, or depreciation in value of (if any part should not be rendered entirely valueless but only depreciated in value), complainants' railroad to, and property at, Rockport, and of complainants' cars and locomotives rendered valueless or depreciated in value to complainants by reason of the abandonment on the part of the defendants of the upper grand section of their navigation."

Then followed the prayers for further and other relief, and for process. The defendants interposed a general demurrer to the bill, and the case was argued before Justice STRONG at Nisi Prius, who, on the 22d September 1863, filed the following opinion:—

" This bill is an attempt to compel the defendants to put in order, and repair the upper grand section of their Slack Water Navigation, from Mauch Chunk, in Carbon county, to the mouth of Laurel Run, and to maintain the navigation in the condition in which it was prior to and up to the 4th day of June, A. D. 1862. The bill also seeks an account of the loss sustained by the complainants in consequence of the defendants' neglect to repair the navigation, and it prays for a decree that the amount of the loss, as ascertained by an account, be paid by the defendants.

" The grounds upon which the case is rested are, that the defendants, by virtue of their charter, granted on the 13th of February 1822, were authorized to improve the navigation of the river Lehigh, from Wright's creek to its mouth, by dams, locks, or any other device they might think most convenient; and that the Acts of Assembly under which they were incorporated imposed upon them the duty to complete their improvement on or before the 20th day of March, A. D. 1838, and ever after to keep every dam, lock, and sluice of their construction in good order and repair, and the said river freed from all obstacles and obstructions, so that boats, arks, &c., might safely navigate the same. The improvement was completed within the time designated, and the navigation was maintained until the 4th day of June

[Buck Mountain Coal Co. v. Lehigh Coal and Nav. Co.]

1862, when a heavy freshet in the river destroyed the dams, locks, and improvements which had been constructed, and rendered the river wholly innavigable. The bill further shows that the defendants have since the freshet, and up to the time when the bill was filed, wholly neglected and refused to take any steps to put again in order or to repair the dams or locks on the upper grand section of their improvement from Mauch Chunk upward, and that the public highway along the river remains impassable to the great and peculiar injury of the complainants.

"The right of the complainants to the interference of a court of equity is founded upon the averments that they are owners of large bodies of coal-land lying near to the upper grand section of the artificial navigation, at a distance of about four miles therefrom, and that they also own another tract of land adjoining the navigable improvement—a tract purchased by them from Thomas F. Wharton and others, who were the grantees of the defendants; that this adjoining tract of land was secured by them with a view of building a railroad for the transportation of their coal to the navigable improvement of the defendants; that they constructed such a railroad, and have used the same for about twenty years; that they have no other outlet for their coal to market, and that in consequence of the continued innavigability of the river Lehigh, and the condition of the defendants' artificial improvement, their trade is interrupted, and their railroad and other improvements are rendered useless. The case comes before me on a general demurrer to the bill, and six causes of demurrer have been assigned. I shall notice them briefly.

"It is insisted the bill does not show that any contract or agreement was ever made between the complainants and the defendants, by which the latter bound themselves to complete or keep in order that part of their canal which the complainants aver has been suffered to remain in ruins. The exception is true, and were this a bill for specific performance of a contract it would on that account be fatally defective, for there is nothing in it which shows any obligation resting on the defendants to make or to maintain artificial navigation upon the Lehigh river, above Mauch Chunk, growing out of any contract of theirs, either with the complainants or any persons whose rights the complainants have acquired. That the defendants were bound to improve the navigability of the river above Mauch Chunk, and to maintain their improvements so that boats, arks, &c., might safely navigate the same, free from all obstacles and obstructions, is undoubtedly true, but their duty was one arising out of the act which incorporated them—a duty imposed by the legislature, the price of their franchise—not one voluntarily undertaken by any contract entered into with the complainants. I understand the bill, however, to seek not specific execution of a contract, but an injunction against a public

nuisance, from which the defendants have received a special injury. Consequent upon this is the prayer for an account and compensation. To sustain such a bill, it is not necessary that any contract have been made between the parties. If it was the duty of the defendants to make and to maintain the river navigable, to keep their locks, dams, canals, and pools in repair as a public highway, a duty which the Acts of Assembly clearly laid upon them, and if the complainants have suffered special and peculiar injury in consequence of their failure to perform this duty, for which injury there is no adequate remedy at law, there is sufficient ground shown for the interposition of a court of equity.

" A second cause assigned for the demurrer is, that it does not appear in the bill the defendants have failed to use all reasonable diligence, ' since the destruction of their navigation,' to reconstruct the same as a public highway for the use of the complainants and others, under the chartered rights of the defendants. I am of opinion, however, that want of proper diligence in making repairs is sufficiently averred. The canal and works of the defendants were destroyed by the freshet on the 4th day of June 1862, and this bill was not filed until seven months afterward. It charges that up to the time when it was presented, the defendants had neglected and refused to take any steps to place in good order and repair their dams and other works on the upper grand section, and it also charges that when applied to on the 11th of December 1862, for information whether they intended to restore the navigation, they returned an evasive answer. A third cause assigned for the demurrer is, that ' the alleged damage, if any, done to or sustained by the complainants is consequential merely, and not direct, and gives them no claim on the defendants, such as they have preferred in their bill ;' with this I cannot concur. The allegations of the bill are, that the complainants have for many years been owners of coal-lands near and upon the upper grand section of the defendants' works ; that at large expense, after the completion of the locks, dams, &c., and after the artificial highway had been completed, and opened for public use, they had constructed a railroad from their mines to the highway ; that upon it they had erected the necessary works for the preparation and the shipment of coal ; that they had transported their coal over the canal from 1840 until its destruction in 1862, and that they have no other outlet for their coal to market. If the navigation be not restored, their railroad and their works upon the river are comparatively valueless, and their business as coal-shippers is destroyed. The injury they sustain, therefore, is a direct result of the nuisance permitted by the defendants, and as it is a continuing one, and is a peculiar and special injury to the complainants, it comes within the class of cases of which equity takes cognisance even at the suit of private individuals : Daniel's Chan.

[Buck Mountain Coal Co. *v.* Lehigh Coal and Nav. Co.]

Prac. 1858. It is a constant practice of courts of equity to enjoin against permitting artificial navigation to remain out of repair so as to interfere with its use at the suit of a private person whose business requires its use. A very considerable number of cases of this kind are to be found in the English books, as well as in those of this country, and I think this is a most fit exercise of authority by a chancellor, for it is obvious that the evil of permitting highways to fall into decay, though it may be punishable, is not entirely remediable at law. The other causes assigned for demurrer to this bill, in my opinion, have more substance ; the Acts of Assembly under which the defendants were incorporated, and which are recited in the bill, provide a special remedy for neglect of duty to repair the works authorized and required to be constructed and maintained, and they point out a mode by which damages caused by neglect to repair may be ascertained and recovered. By virtue of an act entitled ' An Act to improve the navigation of the river Lehigh,' passed the 20th day of March 1818, authority was given to Josiah White, George F. A. Hauto, and Erskine Hazard, to improve the navigation of the river by dams, locks, or any other device which they might think most convenient, and to demand and receive tolls from boats and vessels making use of their improvement. The 9th section of the act provided that, if the grantees of the franchise should neglect or refuse to keep in good order or repair any dam, lock, or sluice of their own construction, or to remove any obstacle which might occur, so that boats, arks, rafts, or other vessels might safely navigate the river, any person might apply to the judges of the Court of Common Pleas of the county where the default should occur. Whereupon a commission should be appointed to view and report thereon. The section further directed that in case an offence against the act (*i. e.*, neglect to repair) was reported, the grantees might be indicted, and, on conviction, they should be liable to pay all damages resulting from their neglect of duty, to be recovered before a court of competent jurisdiction, and should also be liable to pay a fine. Thus a statutory mode of obtaining redress for private as well as public wrongs was provided. The rights of Josiah White, George F. A. Hauto, and Erskine Hazand subsequently became vested in the defendants, and the legislature, by the Act of February 13th 1822, recognising the transfer, conferred upon them the privileges, and imposed the duties prescribed in the Act of 1818. By the 12th and 13th sections it was particularly enacted that the provisions of the 9th section of the Act of 1818 should remain unchanged, except so far as altered or supplied by the act itself. No change, however, was made in the prescribed mode of ascertaining a default, and recovering compensation for consequent injury. For any injury which the complainants have sustained there is then a remedy provided by

14 Wr.—7

[Buck Mountain Coal Co. *v.* Lehigh Coal and Nav. Co.]

the Acts of Assembly under which the defendants exist, and to that remedy I think the complainants are confined. In such a case I understand the Act of March 2d 1806, as denying jurisdiction to this court over the complainants. For these reasons I shall sustain the demurrer, and dismiss the bill of the complainants with costs.

" Let a decree be drawn accordingly."

Which was the error assigned.

*J. Cooke Longstreth* and *C. Guillou*, for plaintiffs in error, contended: 1. That the Act of 1806 did not oust the jurisdiction in equity to interfere by injunction.

2. That it did not oust the jurisdiction of this court over corporations such as the defendants.

3. That the declaration in the defendants' act of incorporation of a liability for damages, to be recovered after conviction, did not take away the right of complainants to sue for such damages without any conviction having been had.

4. That courts of equity will not refuse to give full relief, because a portion of that relief might be obtained in an action at law.

*W. M. Meredith, G. M. Wharton,* and *C. Gibbons,* for defendants in error, argued: 1. That the complainants had shown no ground for their complaint arising from any contract or agreement between the parties.

2. That the alleged damage sustained by the plaintiffs is too consequential, and not direct.

3. The injury, if any has been inflicted by the defendants, is local, and should be redressed in the county where it has been sustained. This, independently of the Act of Assembly ; and

4. There was a special remedy provided by statute for the asserted injury, to which the plaintiffs were bound to resort.

The opinion of the court was delivered, June 22d 1864, by

THOMPSON, J.—The bill filed in this case sets forth that, by the Act to incorporate the Lehigh Coal and Navigation Company, passed the 13th of April 1822, the Lehigh river, between the points intended to be improved, viz., between its mouth and the Great Falls, was divided into two grand sections ; the first lying between the mouth of the river and the Nescohoning creek ; the second between the last-mentioned point and the foot of the Great Falls ; that the entire work, including both sections, had long been completed and in successful operation ; that on or about the 4th of June 1862, an extraordinary flood occurred in the Lehigh, whereby " the navigation of the defendants and the dams, locks, and other devices, were damaged, broken, and partially swept

[Buck Mountain Coal Co. v. Lehigh Coal and Nav. Co.]

away," rendering the whole of the second grand section entirely innavigable, a distance of about twenty-five miles, or more. To compel the company to repair, or reconstruct this portion of their works, and to compensate the complainants for the loss to them, as a means of transporting coal to market, is the object of this bill.

No contract relation of any kind is alleged to exist between the complainants and defendants; their claim to equitable interposition rests, therefore, alone upon the duty of the company to keep and maintain these works in good order and repair, and this presents for consideration the question raised by the demurrer, whether the complainants have by their bill presented " such a case as entitles *them* in a court of equity to the discovery and relief prayed for, touching the matters contained in the said bill," or any of them.

It seems to us they are not the proper parties to enforce this duty on part of the company to the public, in the absence of any *special injury* to themselves or property; and by this we mean, any injury, special in its operation, resulting from a failure to perform some specified duty to them, or to make compensation for injury and deterioration to their property, as contradistinguished from injury to them in common with the whole public, in the loss of a convenient and valuable highway.

There are many authorities in England and in this country which deny the right of private parties in their own names—in the absence of special laws—when their interests are only in common with the public, to compel the performance of a duty to the public. The reason is, that if one individual may interpose, any other may, and as the decision in one individual case would be no bar to any other, there would be no end to litigation and strife. The general laws of order so necessary to good government forbid anything like this.

In The King v. The Directors of the Bristol Dock Co., 12 East 429, the Lord Chief Justice of the King's Bench, a case involving this question, said: " The injury, if any, is to all the king's subjects, and that is the subject-matter of indictment, and not of action, otherwise any person who had before used the waters of the rivers might equally claim compensation; for which there is no pretence." To this effect is Rose *et al. v.* Miles, 4 M. & S. 101; Iveson *v.* Moore, 1 Ld. Raym. 486. See Thomas Earle's Case, Carth. 173; Wilkes *v.* The Hungerford Market Co., 2 Bing. N. C. 281; Grierly *v.* Codling *et al.*, 2 Bing. 263.

In Bigelow *v.* The Hartford Bridge Co., 14 Conn. 565, it was held, per Storrs, J., that a " bill in equity for an injunction against a public nuisance will not be sustained by a private party, unless it shows a particular injury to the plaintiff, distinct from that which he suffers in common with the rest of the public." So in the case

òf The Councils of Reading *ex rel.* Fitchthorne and Dehart *v.* The Commonwealth, 1 Jones 196, which was an application for a *mandamus* to compel the councils to remove some obstructions from the sidewalks of a street, charged as a nuisance, Gibson, C. J., said, that " the obstruction of a sidewalk not being more injurious to the relators in the *mandamus*, whereby it is sought to abate it, than to the inhabitants at large, the remedy to attain that end is by indictment exclusively." The doctrine of this point was also fully discussed by the same learned judge in The Commonwealth *v.* Burrell, 7 Barr 34. That was a *quo warranto* at the suggestion of a private party, and of this attempt he remarked : " The Commonwealth has her own chosen officer for the protection of her own rights (and the rights of the whole community are what constitute public rights or the rights of the Commonwealth), and as she has not explicitly allowed his office to be assumed by any one who may please to try his hand at the business of prosecution, as his self-constituted *locum tenens*, we dare not assume the power to allow it." I might largely multiply the citation of authorities to the same effect, but these will suffice to prove the principle, and I forbear. It is plain, therefore, that a private individual may not, in the absence of a special right, or special authority, vindicate the public for the breach of duties owing to her alone. Nobody will doubt but that he may enforce against public corporations contracts and duties which they ought to perform towards himself, and in doing this sometimes the public interests are subserved, and this is all right. But it is his special interest that gives him the right to act. This might be enough for this case, but it may not be out of place to add that we have no doubt but the remedy by a bill for an injunction, sued out on the part of the Commonwealth by her attorney-general, would lie against a company to compel them to observe their charter obligations. It would in this case be a substitute for a *mandamus*, and come within the power given to the courts in equity to control corporations other than municipal.

If, then, the complainants have no right to maintain their bill to enjoin the respondents from neglecting to repair and put in operation their slackwater navigation, they have no right to a decree compensating them for any damage suffered. This right is only incidental to the maintenance of their bill to control the company in the matter of repairing or rebuilding their works. If they could do that, damages incident to the non-repair, and proper to be allowed, might, on the principle that it arose out of the subject-matter of complaint, and equity jurisdiction having attached the whole subject in all its aspects, would be disposed of. But alone, as an independent ground of complaint and claim, equity would not entertain a bill ; damages merely for all sorts of injuries are only properly cognisable at law. A decree or decision, there-

[Buck Mountain Coal Co. *v.* Lehigh Coal and Nav. Co.]

fore, against the complainants' right to maintain an injunction, is necessarily a denial of his equity to have damages on the accounts prayed. Upon these grounds the bill might properly have been dismissed.

It is not necessary to discuss the grounds of the alleged claim of damages in this case, as the right to them in this proceeding falls altogether by reason of the views just expressed. Nor is it essential to discuss the question whether the Act of 1818 provided a specific remedy in this case, which excludes a resort to a bill in equity, as we think the whole case is covered by the views taken. We think the action of the court at Nisi Prius, on the demurrer, must be sustained, and accordingly the decree is affirmed, at the cost of the appellants.(*a*)

(*a*) By the Act of the 4th of March 1863, the Lehigh Coal and Navigation Company were relieved from rebuilding their slackwater, destroyed by the flood of 1862, under terms proposed in the act, and which were accepted by the company. Although the act, being private, could not aid the demurrer, it not having been referred to in the bill, yet if the demurrer had been over-ruled, and it had been pleaded, it would most probably have produced a similar result with the one arrived at in ruling the demurrer.