(No. 52885.—

THE VILLAGE OF WILSONVILLE et al., Appellees, v.
SCA SERVICES, INC, Appellant.

*Opinion filed May 22, 1981.—Rehearing denied*
*October 19, 1981.*

2

4

Henry L. Mason III, Thomas M. McMahon, and Robert M. Olian, of Sidley & Austin, of Chicago; Fred C. Prillaman of Mohan, Alewelt & Prillaman, of Springfield; and Stuart Dobbs, of Denby, Dobbs, Meno & Bloomer, of Carlinville (William C. Brashares and Melvin J. Duvall, Jr., of Cladouhos & Brashares, of Washington, D.C., and Lawrence C. Hutchings, of Boston, Massachusetts, of counsel), for appellant.

Paul C. Verticchio, of Gillespie, for appellees Village of Wilsonville and Macoupin County Farm Bureau.

Tyrone C. Fahner and William J. Scott, Attorneys General, of Springfield (Richard W. Cosby, Ann L. Carr, and A. L. Zimmer, Assistant Attorneys General, of counsel), for the People.

Kenneth R. Boyle, State's Attorney, of Carlinville, for appellee the County of Macoupin.

Eugene H. Bernstein, of Isham, Lincoln & Beale, of Chicago, for *amicus curiae* Commonwealth Edison Company.

John M. Cannon and Susan W. Wanat, of Chicago, for *amici curiae* Chicago Association of Commerce and Industry, Illinois Manufacturers' Association, and Mid-America Legal Foundation.

Mary C. Bryant, of Chicago, and Dorothy A. Darrah and Richard S. Mallory, of Washington, D.C., for *amicus curiae* United States Environmental Protection Agency.

David O. Ledbetter, of Washington, D.C., for *amicus curiae* United States Department of Justice.

Kirkland & Ellis, of Chicago (Daniel W. Vittum, Jr.,

Frank L. Winter, and Donald W. Rupert, of counsel), for *amici curiae* John Sexton Sand & Gravel Corporation and John Sexton Contractors.

MR. JUSTICE CLARK delivered the opinion of the court:

On April 18, 1977, the plaintiff village of Wilsonville (the village) filed a complaint seeking injunctive relief in the circuit court of Macoupin County. Plaintiffs Macoupin County and the Macoupin County Farm Bureau were granted leave to intervene on April 29, 1977, and May 9, 1977, respectively. They filed complaints substantially similar to the village's complaint. The gravamen of the complaints was that the operation of the defendant's chemical-waste-disposal site presents a public nuisance and a hazard to the health of the citizens of the village, the county, and the State. The Attorney General of Illinois filed a complaint on May 26, 1977, seeking an injunction pursuant to the Environmental Protection Act (Ill. Rev. Stat. 1975, ch. 111½, pars. 1003(d), 1003(n), 1012(d), 1043). After several amendments to the complaints and several motions were made and decided, the Attorney General's action and the other action were consolidated and set for trial. Trial began on June 7, 1977, consumed 104 days, and resulted in judgment for the plaintiffs on August 28, 1978. The trial court's judgment order concluded that the site constitutes a nuisance and enjoined the defendant from operating its hazardous-chemical-waste landfill in Wilsonville. It ordered the defendant to remove all toxic waste buried there, along with all contaminated soil found at the disposal site as a result of the operation of the landfill. Further, the court ordered the defendant to restore and reclaim the site.

The defendant appealed. The Appellate Court for the Fourth District unanimously affirmed the trial court's judgment. (77 Ill. App. 3d 618.) We allowed the defend-

ant's petition for leave to appeal. (73 Ill. 2d R. 315.) We affirm.

The record in this matter is over 13,000 pages long. The appellate court opinion sets out many pertinent facts. It is only necessary to summarize them here.

The defendant has operated a chemical-waste landfill since 1977. The site comprises approximately 130 acres, 90 of which are within the village limits of the plaintiff village. The remaining 40 acres are adjacent to the village. The defendant enters into agreements with generators of toxic chemical waste to haul the waste away from the generators' locations. The defendant then delivers it to the Wilsonville site, tests random samples of chemical waste, and then deposits the waste in trenches. There are seven trenches at the site. Each one is approximately 15 feet deep, 50 feet wide, and 250 to 350 feet long. Approximately 95% of the waste materials were buried in 55-gallon steel drums, and the remainder is contained in double-wall paper bags. After the materials are deposited in the trenches, uncompacted clay is placed between groups of containers and a minimum of one foot of clay is placed between the top drum and the top clay level of the trench.

The site is bordered on the east, west, and south by farmland and on the north by the village. The entire site, the village, and much of the surrounding area is located above the abandoned Superior Coal Mine No. 4, which operated from 1917 to 1954. The No. 6 seam of the mine was exploited in this area at a depth of 312 feet. The mining method used to extract coal was the room-and-panel method, whereby about 50% of the coal is left in pillars which provide some support for the earth above the mine. There was testimony at trial by Dr. Nolan Augenbaugh, chairman of the Department of Mining, Petroleum and Geological Engineering at the University of Missouri at Rolla, that pillar failure can occur in any mine where there is a readjustment of stress. Also on the defendant's

site is a 30- to 40-feet-high pile of "gob," or mine spoil of coal, shale, and clay, which was accumulated over the time the mine was operated. Acid drainage from the mine has seeped into the ground and contaminated three surface drainage channels at the site. The defendant has attempted to remedy this situation by covering the surface of the "gob pile" with excess soil from the trenches.

There are 14 monitoring wells along the perimeter of the site. They are designed to detect liquids which seep through the soil and into the wells. They are not designed to contain liquids, however. In fact, monitoring wells Nos. 5 and 6 are 650 feet apart, which would allow many materials to pass between those two wells and not be discovered. The wells are sampled quarterly by a private laboratory, and test results are submitted to the Illinois Environmental Protection Agency (IEPA). Additional water samples are taken from three surface channels and are tested and reported in the same manner as samples taken from the wells. The surface drainage and the ground-water drainage from the site are to the south, away from the village and toward farmland.

The village has no sewage-treatment plant and no municipally owned sewage system. Most homes are served by septic tanks, and some homes and businesses are connected to private sewers. The water-distribution system is centralized, and water is purchased from Gillespie, Illinois. The system was built in 1952 after the village tried unsuccessfully to find sufficient water by drilling municipal wells in the area. There are still 73 water wells in the village, some of which are used to water gardens or wash cars. At least one well is used to water pets, and another is used for drinking water. South of defendant's site, approximately one-half mile from the gob pile, is the Vassi Spring, the owner of which intends to use it as his water supply when he builds his home. Further south are four more springs used to water livestock.

On February 11, 1976, the defendant applied to the IEPA for a permit to develop and operate the hazardous-waste landfill. A developmental permit was issued by the IEPA on May 19, 1976. After a preoperation inspection was conducted by the IEPA, an operational permit was issued to the defendant on September 28, 1976. Each delivery of waste material to the site must be accompanied by a supplemental permit issued by the IEPA. A supplemental permit specifies the chemical nature and quantity of the waste to be deposited at the sites. Between November 12, 1976, and June 7, 1977, the first day of trial, the defendant had obtained 185 such permits.

The materials deposited at the site include polychlorinated biphenyls (PCBs), a neurotoxic, possibly carcinogenic chemical which it has been illegal to produce in this country since 1979. Due to the extensive use of PCBs in electrical equipment such as transformers, capacitors, and heat-transfer systems, and in hydraulic systems, any PCBs that were produced legally now have to be disposed of when they are no longer in use. PCBs have been stored at the site in liquid, solid and semi-solid form. Additionally, there are a number of now-empty drums which had once contained PCBs, which are also buried at the site. Other materials buried at the site in large quantities are solid cyanide, a substance known as $C_{5,\ 6}$, paint sludge, asbestos, pesticides, mercury, and arsenic. Considerable evidence was adduced to show that these and other substances deposited at the site are extremely toxic to human beings. Some of the adverse reactions which could result from exposure to these materials are pulmonary diseases, cancer, brain damage, and birth defects.

The general geologic profile of the site shows a surface layer of about 10 feet of loess (wind-blown silt and clay material), under which lies 40 to 65 feet of glacial till. In the till material there is a thin sand layer of a few inches to approximately two feet. Some ground water has been

found in the sand layer. All trenches dug at the site have between 10 to 15 feet of glacial till below them. The glacial till is reported to be very dense and is not very permeable. Thus liquids do not travel through it quickly.

Permeability studies conducted before the site opened by John Mathes, a professional engineer hired by the defendant, indicate permeability results ranging from $7.4 \times 10^{-8}$ centimeters per second to $1.2 \times 10^{-8}$ centimeters per second (cm/sec.). (The larger the negative exponent is, the less permeable the soil. *E.g.*, a finding of $10^{-8}$ cm/sec. indicates that the soil is less permeable than would a reading of $10^{-4}$ cm/sec.) After the site opened, Mathes took permeability samples from or near the bottoms of the trenches that had been dug. His second set of results ranged from $1.4 \times 10^{-7}$ cm/sec. to $.9 \times 10^{-7}$ cm/sec.

Dr. James Williams, an engineering geologist with the Missouri Geology and Land Survey, also made permeability findings on behalf of the defendant from samples taken from the site after it opened. Dr. Williams' results ranged from $7 \times 10^{-6}$ cm/sec. to $1 \times 10^{-7}$ cm/sec. Dr. Williams testified on cross-examination that the general permeability of the site is considered to be greater than $1 \times 10^{-8}$ cm./sec. and that he would not expect the average permeability of the soil to be as low as that used for samples.

In the interim between the opening of the site and the time of trial, the IEPA adopted a suggested permeability standard of $1 \times 10^{-8}$ cm/sec. for hazardous-waste landfills.

Subsidence of the earth underneath the site is another contention raised by the plaintiffs to support their thesis that the site is unsafe and is therefore an enjoinable nuisance. Dr. Nolan Augenbaugh testified extensively at trial. Dr. Augenbaugh took pictures of the area from an airplane as well as at ground level. During his testimony, he pointed out where subsidence occurred in the pictures he had taken. Dr. Augenbaugh stated that he had observed sub-

sidence in a wheat field on the Wilbur Sawyer farm on June 17, 1977. Dr. Augenbaugh also testified that a subsidence basin lies to the northeast of the disposal site. The pictures also indicate, according to Dr. Augenbaugh, fractures in the ground. One picture depicts a fault, which, Dr. Augenbaugh explained, is a "fracture where there's been differential movement of the two blocks. One block has been moved more than the other block." Sawyer, the farmer, told Dr. Augenbaugh the cracks had begun to appear approximately two months before, which would have been spring 1977. Several of these subsidences and fractures are located approximately one-half mile from the western boundary of the lower part of the disposal site. Dr. Augenbaugh testified that, in his opinion, subsidence can and will occur at the disposal site. Further, that ruptures in the earth would occur which, like an open pipe, would act as conduits for artesian water to reach the trenches, thereby contaminating the water.

Dr. Augenbaugh was recalled to testify on rebuttal. He testified that on March 22, 1978, he returned to the Sawyer farm. With the use of a backhoe, Dr. Augenbaugh had a trench dug across the subsidence cracks which he had observed earlier. When the digging was completed, there was a trench nine feet long and approximately three feet wide, with a maximum depth of a little over eight feet. Photographs were taken and slides prepared of the operation at the site. As the trench was being dug, water began to seep into the trench at a depth of approximately 4 to 4½ feet. Dr. Augenbaugh testified that the water flowed from subsidence fractures which were below the surface of the ground. Dr. Augenbaugh then poured some green dye into a surface fracture which was located approximately 10 feet away from the trench. The green dye entered the trench through two openings within 25 minutes.

Thomas O. Glover, a mining engineer and liason officer with the United States Bureau of Mining, Depart-

ment of the Interior, also testified regarding subsidence. Glover defined subsidence as the settling of the ground, due to the diminution of the underground support structure, and either the pillars pushing into the fine clay bottom below the coal system, or the roof fracturing immediately above the coal seam and continuing to the surface. He stated that subsidence normally can be expected to appear, on the average, 40 years after a mine has closed down. Glover never visited the instant disposal site, but he had examined the information relative to Superior Mine No. 4 and he had witnessed subsidences many times in the field over the course of 27 years as a mining engineer. Glover offered the opinion that there is a possibility of subsidence wherever coal is mined and underground support is removed.

Several of the defendant's expert witnesses, James Douglas Andrews, the designer of the site and a consulting engineer for the defendant, John A. Mathes, an engineer, Steven Hunt, a geologist with the Illinois State Geological Survey (ISGS), and Paul B. DuMontelle, an engineering geologist with ISGS and coordinator of environmental geology for the Survey, testified in summary that there would be subsidence at the site, but that it would not be deep, would close in a short time, and could be repaired by means of engineering techniques.

Another of plaintiffs' witnesses, Dr. Arthur Zahalsky, offered the opinion that an "explosive interaction," resulting in chemical explosions, fires, or emissions of poisonous gases, will occur at the site. Dr. Zahalsky is a professor of biochemistry and head of the laboratory of biochemical parasitology at Southern Illinois University at Edwardsville. He testified in essence that if sufficient oxygen could reach the buried chemicals, and he believed it could, then an explosive interaction of unknown date of occurrence, magnitude, and duration is likely. Moreover, Dr. Zahalsky testified that it is unknown what

interactions might occur when the waste materials combine after the deterioration of the steel containers and paper bags.

The defendant challenged Dr. Zahalsky's opinion during cross-examination and requested him to diagram the precise chemical formula which would result in an explosive interaction. Dr. Zahalsky testified that a precise formula could not be diagrammed. He stated that the defendant's trench logs indicate that several of the chemical wastes have flash points less than 80 degrees Fahrenheit. Zahalsky reviewed the trench logs and gave examples of chemicals, such as paranitroaniline, which is a strong oxidizing agent and may be explosive, and also paint sludge, which has a flash point of less than 80 degrees Fahrenheit, which could result in a chemical fire. Dr. Zahalsky offered one scenario in which acidic chlorinated degreasers would interact with waste phenolic, releasing the phenolics so that the flash point would be achieved, thereby setting off the paint sludges which, in turn, would set off paint wastes, which would achieve the temperature sufficient for the ignition and combustion of liquid PCBs. All of these materials are deposited together in trench No. 3.

Finally, considerable testimony was adduced, much of it conflicting, as to dust, odors, and spills of chemical waste which have occurred in the village. Various residents testified that dust emanating from the site blew toward their houses. Also, odors which caused burning eyes, running noses, headaches, nausea, and shortness of breath were mentioned in testimony. The odors themselves were said to resemble, among other things, fertilizer, insecticide, and burning rubber. There was further testimony that the dust and odors interfered with the witnesses' ability to use their yards for gardening or other recreational uses. The defendant presented witnesses who denied that the disposal site was the source of any odors, and that the

odors resulted from the local practices of openly burning refuse and dumping sewage into a nearby creek.

There was testimony that trucks carrying the waste materials to the disposal site via Wilson Avenue, the main street of the village, sometimes spilled toxic liquids onto the street. The evidence is undisputed, both from the defendant's receiving reports and testimony from IEPA inspectors, that many drums arrived on the site leaking waste materials. Also, Sam Campagna, defendant's site manager, testified that he heard that a drum had once been dropped into a trench rather than stacked using a drum handler. He did not know whether rumors that this practice persisted were true or not, but he had ordered that such a practice cease.

The defendant has raised several issues on appeal: (1) whether the finding of the circuit and appellate courts that the waste-disposal site is a prospective nuisance is contrary to the manifest weight of the evidence; (2) whether those courts applied the wrong legal standard in finding that the waste-disposal site constitutes a prospective nuisance; (3) whether the circuit and appellate courts erred in failing to balance the equities, either in finding a prospective nuisance or in fashioning relief; (4) whether the courts erred in failing to defer to, or to otherwise weigh, the role of the IEPA, the United States Environmental Protection Agency (USEPA), and the Illinois State Geological Survey (ISGS); (5) whether the courts erred in finding that plaintiffs have no adequate remedy at law; (6) whether the courts erred in ordering a mandatory injunction; and, finally, (7) whether the courts' decisions constituted a taking of property without due process of law.

We conclude that the evidence in this case sufficiently establishes by a preponderance of the evidence that the chemical-waste-disposal site is a nuisance both presently and prospectively. The defendant does not challenge the

fact that the spillage from improperly contained chemical waste, the odors, and the dust created by the site constitute a present interference with the right of the plaintiffs to enjoy and use their property. Thus, we will not belabor this point.

The defendant points out three areas where, it argues, the trial court made erroneous findings of fact. The defendant refers to: (1) Dr. Arthur Zahalsky's opinion testimony concerning an explosive interaction and Dr. Stephen Hall's testimony which concurred in that opinion; (2) evidence concerning soil permeability; and, (3) infiltration of water into the trenches, and of migration out of the defendant's trenches of chemical waste either through the "bathtub effect" or subsidence.

We have reviewed the extensive record compiled in this case. While it is true that the defendant vigorously challenged the evidence concerning an explosive interaction, permeability, and infiltration and migration due to subsidence, the defendant has not overcome the natural and logical conclusions which could be drawn from the evidence. Findings of fact made by the trial court will not be set aside unless they are contrary to the manifest weight of the evidence. *John Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 218; *Kenny Construction Co. v. Metropolitan Sanitary District* (1971), 52 Ill. 2d 187, 196.

Defendant argues that Dr. Zahalsky and Dr. Hall are unqualified to render opinions concerning an explosive interaction occurring in the trenches. Dr. Zahalsky is a professor of biochemistry at Southern Illinois University at Edwardsville, the holder of a doctorate in that discipline, and has been active in his field since 1967. Dr. Hall is an associate professor of science and technology in the Department of Chemistry at Southern Illinois University at Edwardsville. He was awarded a doctorate in inorganic and analytical chemistry in 1967, as well as a master's

degree in environmental health. While working on that master's degree, his second, Dr. Hall studied toxicology, a course dealing with the health effects of chemicals, and took courses on air pollution and occupational health and safety as affected by chemicals in the work environment. Currently, Dr. Hall teaches a course in industrial toxicology at the University.

Over a limited objection by the defendant, the court qualified Dr. Hall as an expert in the fields of industrial toxicology, analytical, organic and inorganic chemistry, occupational hygiene, and environmental health.

Defendant placed several experts on the stand to refute the conclusions of Drs. Zahalsky and Hall. These experts testified that the fire-retardant properties of some of the chemicals would prevent chemical fires, that the gases predicted by Dr. Hall due to the mixing of chemicals would not occur, and that other chemical reactions predicted by Dr. Hall would not occur.

The defendant particularly relies upon the opinion of Dr. Raymond D. Harbison, a professor of pharmacology at Vanderbilt University, a toxicologist and consultant to the USEPA on toxic-waste handling. Dr. Harbison offered the opinion that the instant site is the most advanced scientific landfill in this country, and that the inventory system and the "absolute confinement" of the materials to the site render the interaction of the chemicals an impossibility.

At bottom, Dr. Harbison's opinion is premised upon his belief that the materials at the site will be sufficiently confined so that they will not pose a threat to the health or lives of the residents of the village. Dr. Harbison's opinions were discounted by the trial court, however, due to the substantial evidence which shows that the soil is more permeable than originally thought; that there is migration of water out of the trenches; and that there is subsidence in the area. Moreover, Dr. Harbison's opinion

must be further discounted due to his erroneous statement that the waste materials will be sufficiently confined since "there is no ground water to be contaminated anyway below the particular site." Dr. Harbison later amended that statement to say there was no "usable water supply below the site" in terms of volume. This statement is also erroneous and also ignores evidence that the ground water would flow from beneath the site, thereby transporting any contamination into Cahokia Creek and could eventually flow into the Mississippi River. Thus we will not overturn the trial court's findings on this issue. They are amply supported by the manifest weight of the evidence.

The defendant next contends that the appellate and circuit courts misinterpreted the permeability tests admitted into evidence. It is argued that permeability coefficients are but one factor in determining the permeability of soil. We agree, but the fact remains that the defendant placed a good deal of emphasis on the tests conducted by John Mathes and Dr. Williams, which show that the soil at the site is more permeable than the IEPA suggested standard of $1 \times 10^{-8}$ cm/sec. These courts also relied upon the testimony of Dr. Williams, defendant's witness, that the soil was probably even more permeable than indicated in the tests. Based on this evidence the trial court was correct in finding that the permeable nature of the soil, as demonstrated by the coefficients, as one of several factors, poses a threat of migration of chemical waste away from the disposal site. That finding will not be disturbed.

The defendant also contends that the trial court's finding that subsidence warrants closing of the site is erroneous. The defendant argues that, assuming *arguendo* that subsidence would occur at the site, it could be counteracted by engineering techniques. This issue becomes complicated by the fact that the IEPA adopted

a regulation providing that Class I disposal sites (*i.e.*, chemical-waste-disposal sites), must be secure without engineering. The USEPA, however, has recently adopted regulations to require all landfill sites to establish containment-engineering systems to detect and prevent migration of chemicals. (45 Fed. Reg. 33,239-42 (May 19, 1980).) Moreover, the General Assembly has, since the inception of this suit, passed a statute prohibiting the placement of a hazardous-waste-disposal site above a shaft or tunneled mine. Section 21(g) of the Environmental Protection Act provides:

> "No person shall:
>
> * * *
>
> (g) Locate a hazardous waste disposal site above an active or inactive shaft or tunneled mine or within 2 miles of an active fault in the earth's crust. In counties of population less than 225,000 no hazardous waste disposal site shall be located (1) within 1½ miles of the corporate limits as defined on June 30, 1978, of any municipality without the approval of the governing body of the municipality in an official action; or (2) within 1000 feet of an existing private well or the existing source of a public water supply measured from the boundary of the actual active permitted site and excluding existing private wells on the property of the permit applicant.
>
> The provisions of this subsection do not apply to publicly-owned sewage works or the disposal or utilization of sludge from publicly-owned sewage works." (Ill. Rev. Stat. 1979, ch. 111½, par. 1021(g).)

The instant disposal site is above an inactive tunneled mine lying partly within the corporate limits of the village of Wilsonville. Without an express statutory provision stating an act is to have retroactive effect, it can only be applied prospectively. (*Stigler v. City of Chicago* (1971), 48 Ill. 2d 20, 24; *People ex rel. Schmidt v. Yerger* (1961), 21 Ill. 2d 338, 344; 2 A. Sutherland, Statutory Construction sec. 41.04, at 252 (1973).) Thus, the defendant cannot be thought to be in violation of the foregoing provision.

The fact remains, however, that the instant site, which is intended to be permanent, is located above an inactive tunneled mine.

Moreover, Dr. Nolan Augenbaugh testified at great length, supported by many photographs, of the considerable subsidence which has already occurred near the site. In Dr. Augenbaugh's opinion, subsidence will occur at the site itself. The defendant's experts testified that any subsidence would be negligible and shallow and would not present a threat to health or life. Dr. Augenbaugh refuted this testimony. He stated that subsidence would permit chemical-waste materials to seep into the ground water. In addition, Dr. Augenbaugh testified that subsidence would create a "bathtub effect" by permitting water to get into the trenches, eventually rise to the surface, overflow, and contaminate the ground around the site. We think the circuit court was fully justified in giving more weight to Dr. Augenbaugh's well-documented opinion than to the opinions of defendant's experts. We will not disturb that finding.

Another assignment of error raised by defendant is that the circuit court should have allowed its motion to strike the opinion testimony of Drs. Zahalsky and Hall because of lack of a foundation for their opinions, lack of qualifications, and lack of evidence that any intermixing of chemicals would occur.

We again are constrained to disagree with the defendant's characterization of the testimony adduced at trial. Dr. Zahalsky and Dr. Hall testified that oxidizing channels caused by root systems and subsidence of the earth would permit air to reach the chemical-waste materials. Defendant's own site manager testified that the 55-gallon drums and paper bags used to transport the materials to the site were not intended to and would not contain the materials forever. There was evidence in fact that several of the drums were rusting, leaking, and spilling when they arrived

at the site and that others were rolled over the edge of the trenches. Furthermore, photographs taken of the site and admitted into evidence show that the individual drums were not uniformly separated by several feet of clay. Moreover, Dr. Zahalsky, as recognized by the circuit court, is fully qualified in the field of biochemistry, and Dr. Hall is qualified as a chemist and toxicologist. They both testified to possible reactions caused by the intermixing of certain chemicals. They both also stated the reactions were not certainties but that, with the given flashpoints of certain chemicals, the fact that oxygen could reach the waste materials and the highly volatile nature of some of the chemical-waste materials, in their opinions, based upon a reasonable degree of scientific certainty, it was entirely possible that an "explosive interaction" in the form of fires, gaseous emissions, or explosions could occur at the site. While defendant's expert witnesses disputed these opinions and referred to fire-retardant properties of some chemicals, or the unavailability of ambient temperatures due to lack of oxygen, we are unable to say that Drs. Zahalsky's and Hall's opinions were wrong and the other experts were right. Drs. Zahalsky's and Hall's opinions are at least as plausible as defendant's experts, are based on explicit examples of possible chemical reactions, are buttressed by the two doctors' qualifications, and are supported by evidence concerning conditions at the site which indicate intermixing could occur. The trial court was correct in denying the motion to strike.

As the defendant candidly admits about its next assigned error, it cannot prove that 13 persons did not smell odors or see dust emanating from the site. Therefore, it cannot argue that the court's finding based on this evidence was contrary to the manifest weight of the evidence. The defendant does argue, however, that evidence of dust and odors does not justify ordering closure of the site. Less restrictive relief must be ordered instead. We agree, of

course, that dust and odors alone do not justify the relief which has been ordered in this case. "Whether smoke, odors, dust or gaseous fumes constitute a[n] [enjoinable] nuisance depends on the peculiar facts presented by each case." (*City of Chicago v. Commonwealth Edison Co.* (1974), 24 Ill. App. 3d 624, 631-32, wherein it was held that "no unreasonable or substantial injury" was established so as to warrant enjoining the defendant from operating its plant (24 Ill. App. 3d 624, 633).) But, when the dust and odors the trial court found to be present at the site are considered together with the other evidence indicating that the air, water, and earth in and around the site will become contaminated, the trial court's relief is not excessive.

The same is true of defendant's argument that the evidence of spillage from trucks as they were driven through the village does not warrant closure of the site. Evidence of spillage is simply an additional reason the circuit court ordered the site closed. Whether spillage alone would justify closure is not before us.

The trial court herein concluded that defendant's chemical-waste-disposal site constitutes both a private and a public nuisance. Professor Prosser has defined a private nuisance as "a civil wrong, based on a disturbance of rights in land" (Prosser, Torts sec. 86, at 572 (4th ed. 1971)), and a public nuisance as "an act or omission 'which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects.' " (Prosser, Torts sec. 88, at 583 (4th ed. 1971) quoting, Stephen, General View of the Criminal Law of England 105 (1890); *City of Chicago v. Festival Theatre Corp.* (1980), 88 Ill. App. 3d 216, 223.) Prosser has also quoted the following, more precise definition of a public nuisance: " 'A common or public nuisance is the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works

some substantial annoyance, inconvenience or injury to the public.' " (Prosser, Torts sec. 88, at 583 n.29 (4th ed. 1971), quoting, *Commonwealth v. South Covington & Cincinnati Street Ry. Co.* (1918), 181 Ky. 459, 463, 205 S.W. 581, 583.) It is generally conceded that a nuisance is remediable by injunction or a suit for damages. See *Belmar Drive-In Theatre v. Illinois State Toll Highway Com.* (1966), 34 Ill. 2d 544, 546.

The defendant herein argues that "[e]ven if some or all of plaintiffs' evidence is deemed believable, the findings of the courts below that [defendant's] conduct constitutes a prospective nuisance must be reversed for failure to *** balance the reasonableness and utility of the defendant's conduct, the harm to the plaintiff, and the general societal policy toward risk-taking before [a court may] find an actionable nuisance present." The defendant continues that the law of Illinois requires that the circuit court engage in a balancing process before reaching a conclusion that the waste disposal site presents a prospective nuisance. The appellate court appears to have agreed with the defendant that the trial court did not engage in a balancing process:

> "The record in the case on appeal indicates that the trial court acknowledged the need for the landfill facility and the substantial investment defendant had made in it but stated in its memorandum opinion, 'The court will not balance public benefit or public inconvenience against the individual right,' thus, apparently refusing to engage in the balancing." (77 Ill. App. 3d 618, 638.)

We do not agree, however, with the foregoing characterization of the trial court's statement. The trial court's statement is a direct quotation from *Wente v. Commonwealth Fuel Co.* (1908), 232 Ill. 526, 533. There, this court affirmed a decree in equity which enjoined the defendant from piling its coal against the plaintiff's building and from operating its coal hopper in the manner in which it had

previously been operated. This court said:

"The business of the defendant is a necessary one and it is not a nuisance *per se*, but if a business is offensive to such a degree as to materially interfere with ordinary physical comfort, measured, not by the standard of persons of delicate sensibilities and fastidious habits, but by the habits and feelings of ordinary people, and the damages are of a nature which cannot be adequately compensated for in an action at law, a court of equity will grant an injunction. In such a case the court will not balance public benefits or public inconvenience against the individual right. (*Seacord v. People,* 121 Ill. 623.)"

It is reasonably clear that this court and the circuit court meant that where individual rights are unreasonably interfered with, the public benefit from a particular facility will not outweigh the individual right, and the facility's use will be enjoined or curtailed. Such a conclusion presupposes a balancing process with the greater weight being given to the individual's right to use and enjoy property over a public benefit or convenience from having a business operate at a particular location. In such an instance, the individual's right to noninterference takes precedence.

Moreover, the trial court did engage in a balancing process, as is made clear by the following excerpt from the trial court's memorandum opinion.

"It is the opinion of the Court that the state of the law is such that nuisance cannot be justified on the ground of necessity, pecuniary interest, convenience or economic advantage.

The Court understands as does counsel that there is a need for disposal of industrial hazardous wastes. However, where disposal of wastes create a nuisance said disposal site may be closed through legal action.

Substantial sums of money have been expended by the defendant in developing and operating the Earthline site at Wilsonville. Not only is the site convenient to nearby in-

dustries but it is a profit producer for the defendant. All of these elements are relevant to our economic system but notwithstanding the same it is the opinion of the Court that nuisances cannot be justified on such grounds when we have substantial injury to individual rights, community rights, substantial damage to human beings and other living things.

The Court recognizes that in time of war or great national emergency the creation of a nuisance may be legally allowed and/or authorized by statute. Such is not the situation before the Court in this cause.

Whether or not a business is useful or necessary or whether or not it contributes to the welfare and/or prosperity of the community are elements to be considered in a serious manner but said elements are not determinative as to whether or not the operation is a nuisance.

The importance of an industry to the wealth and prosperity of an area does not as a matter of law give to it rights superior to the primary or natural rights of citizens who live nearby. *However, such matters may be considered and have been in this case.*

It is the opinion of the Court that trifling annoyances or inconveniences of an operation will not give the character of a nuisance to a business that is useful and necessary to society.

A significant inquiry is—was the business established and then persons moved into the business area after it was established and subsequent thereto the business operation moved in and now complaints are made by the citizens who were located in the area before the business was so located. It is the opinion of the Court that if a business is located in a certain area before complainants moved into the area and if the complainants come to the nuisance this may constitute a defense or operate as an estoppel. A person cannot place himself in a position where you suffer and then complain. In this case the defendant established its chemical waste landfill near the area where persons of the Village had resided for many years. Complaints came from residents many of whom lived in the area long before the industrial waste disposal site was ever established.

An industrial waste disposal site in and adjacent to a village means that the hazardous waste disposal operation is near or next to homes, families—children, youth, middle

aged and old people—sick people, well people—sensitive persons and anxious and fearful persons. The location of a business has significance in reference to being a nuisance or not being a nuisance." (Emphasis added.)

We think the foregoing indicates that the trial court did carefully engage in a balancing process between the site's social utility and the plaintiffs' right to enjoy their property and not suffer deleterious effects from chemical wastes. Accordingly, the defendant's argument that the trial court did not balance the equities in this case is without merit.

The defendant's next contention is that the courts below were in error when they failed to require a showing of a substantial risk of certain and extreme future harm before enjoining operation of the defendant's site. We deem it necessary to explain that a *prospective* nuisance is a fit candidate for injunctive relief. Prosser states: "Both public and private nuisances require some substantial interference with the interest involved. Since nuisance is a common subject of equity jurisdiction, the damage against which an injunction is asked is often merely threatened or potential; but even in such cases, there must be at least a threat of a substantial invasion of the plaintiff's interests." (Prosser, Torts sec. 87, at 577 (4th ed. 1971).) The defendant does not dispute this proposition; it does, however, argue that the trial court did not follow the proper standard for determining when a prospective nuisance may be enjoined. The defendant argues that the proper standard to be used is that an injunction is proper only if there is a "dangerous probability" that the threatened or potential injury will occur. (See Restatement (Second) of Torts sec. 933(1), at 561, comment *b* (1979).) The defendant further argues that the appellate court looked only at the potential consequences of not enjoining the operation of the site as a nuisance and not at the likelihood of whether harm would occur. The defendant assigns error on this basis.

We agree with the defendant's statement of the law,

but not with its urged application to the facts of this case. Again, Professor Prosser has offered a concise commentary. He has stated that "[o]ne distinguishing feature of equitable relief is that it may be granted upon the threat of harm which has not yet occurred. The defendant may be restrained from entering upon an activity where it is highly probable that it will lead to a nuisance, although if the possibility is merely uncertain or contingent he may be left to his remedy after the nuisance has occurred." (Prosser, Torts sec. 90, at 603 (4th ed. 1971).) This view is in accord with Illinois law. (*People ex rel. Difanis v. Futia* (1978), 56 Ill. App. 3d 920, 926; *Fink v. Board of Trustees* (1966), 71 Ill. App. 2d 276, 281-82.) In *Fink* the plaintiff sought to enjoin construction of a dam and also the discharge of sewage effluent in a watercourse which flowed past plaintiffs' property. Construction of the dam was not enjoined, but the discharge of effluent was prospectively enjoined. The court stated:

"While, as a general proposition, an injunction will be granted only to restrain an actual, existing nuisance, a court of equity may enjoin a threatened or anticipated nuisance, where it clearly appears that a nuisance will necessarily result from the contemplated act or thing which it is sought to enjoin. This is particularly true where the proof shows that the apprehension of material injury is well grounded upon a state of facts from which it appears that the danger is real and immediate. While care should be used in granting injunctions to avoid prospective injuries, there is no requirement that the court must wait until the injury occurs before granting relief." (71 Ill. App. 2d 226, 281-82.)

We agree.

In this case there can be no doubt but that it is highly probable that the chemical-waste-disposal site will bring

about a substantial injury. Without again reviewing the extensive evidence adduced at trial, we think it is sufficiently clear that it is highly probable that the instant site will constitute a public nuisance if, through either an explosive interaction, migration, subsidence, or the "bathtub effect," the highly toxic chemical wastes deposited at the site escape and contaminate the air, water, or ground around the site. That such an event will occur was positively attested to by several expert witnesses. A court does not have to wait for it to happen before it can enjoin such a result. Additionally, the fact is that the condition of a nuisance is already present at the site due to the location of the site and the manner in which it has been operated. Thus, it is only the damage which is prospective. Under these circumstances, if a court can prevent any damage from occurring, it should do so.

The defendant next asserts that error occurred in the courts below when they failed to defer to the IEPA and the USEPA, as well as when they failed to give weight to the permits issued by the IEPA. This assertion has no merit, however, because the data relied upon by the IEPA in deciding to issue a permit to the defendant were data collected by the defendant, data which have been proved at trial to be inaccurate. In particular, defendant's experts concluded that any subsidence at the site would be negligible. The IEPA (as well as the USEPA) adopted this inaccurate conclusion in deciding to issue a permit to the defendant.

We also disagree with the defendant that since the plaintiffs could seek review from the IEPA's decision to grant permits to the defendants through the Pollution Control Board they have an adequate remedy at law and are unable to obtain relief in a court of equity. First, the plaintiffs are not seeking a review of the issuance of permits. The plaintiffs seek to enjoin a nuisance, a matter which is properly brought in a court of equity. This court

has stated that jurisdiction exists in the circuit court "to abate public nuisances which may endanger the general welfare." *(People ex rel. Scott v. Janson* (1974), 57 Ill. 2d 451, 460.) Thus, the trial court has subject matter jurisdiction to decide the issues raised herein, and to award appropriate equitable relief.

The next issue we consider is whether the trial court erroneously granted a permanent injunction. The defendant argues first that the courts below granted injunctive relief without proof that the alleged injury is both substantial and certain to occur. We have already addressed this question in discussing whether relief may be granted for a prospective nuisance. We will not unduly prolong this already lengthy opinion with duplicative discussion. The second argument raised is that the courts below did not balance the equities in deciding to enjoin the defendant from continuing to operate the waste-disposal site. Defendant cites *Harrison v. Indiana Auto Shredders Co.* (7th Cir. 1975), 528 F.2d 1107, for the proposition that the court must balance the relative harm and benefit to the plaintiff and defendant before a court may enjoin a nuisance. (528 F.2d 1107, 1109.) A balancing process is implicit in the following statements made by this court in *Haack v. Lindsay Light & Chemical Co.* (1946), 393 Ill. 367, 373, 375:

> "It is equally clear that the rule in this State and generally, is, and should be, that even though a right has been established in law, a court of equity will not, as a matter of course, interpose by injunction but will consider all the circumstances, the consequences of such action and the real equity of the case.
>
>             \* \* \*
>
> To entitle one to injunctive relief he must establish, as against the defendant, an actual and substantial injury and not merely a technical incon-

sequential wrong entitling him to nominal damages, only. To warrant the allowance of the writ of injunction it must clearly appear that some act has been done or is threatened against the plaintiff which will produce an irreparable injury to him. (*Cleveland v. Martin*, 218 Ill. 73; *Girard v. Lehigh Stone Co.* 280 Ill. 479; *Dunn v. Youmans*, 224 Ill. 34; *Springer v. Walters*, 139 Ill. 419.) As this court observed in *Klumpp v. Rhoads*, 362 Ill. 412, 'If the damages are of a nature which cannot be adequately compensated for in a suit at law, equity will afford relief by injunction. On the other hand, lawful and useful business may not be stopped on account of trifling or imaginary annoyances which do not constitute real injury.' " (393 Ill. 367, 375.) We would add that an injunction should be reasonable and should only be as broad as is essential to safeguard the rights of the plaintiff. *Toushin v. City of Chicago* (1974), 23 Ill. App. 3d 797, 804.

In *Harrison*, an auto shredder operated its business in a residential neighborhood in Indianapolis. There was considerable testimony from nonexperts that the shredder created too much noise, vibration, and air pollution in the forms of dust and debris. The defendant shredder company defended on the ground that while difficulties in starting up the operation had occurred, it had taken steps, and would do whatever further was necessary, to abate the nuisance. Several experts testified that the noise, vibration, and pollution were well within permissible State and local standards. After a 30-day trial, the court issued a permanent injunction ordering the shredder to cease operations and awarded permanent and punitive damages to the plaintiffs for the diminution in value of their property. The trial court conceded that the shredder performed a "very real social function" in disposing of and recycling old automobiles, but concluded that the machine ought

to be somewhere else. (528 F.2d 1107, 1119.) The court of appeals agreed that the shredder's effect upon the quality of life in the neighborhood entitled the plaintiffs to some form of equitable relief and damages. The court did not, however, view the complete cessation of operations as appropriate to the facts presented. The court stated:

> "Reasonableness is the standard by which the court should fashion its relief in ordinary nuisance cases, *Meeks v. Woods,* 66 Ind. App. 594, 118 N.E N.E. 591 (1918), and reasonableness is also the appropriate standard for relief from environmental nuisance. Ordinarily a permanent injunction will not lie unless (1) either the polluter seriously and imminently threatens the public health or (2) he causes non-health injuries that are substantial and the business cannot be operated to avoid the injuries apprehended. Thus the particular situation facts of each pollution nuisance case will determine whether a permanent injunction should be issued." (528 F.2d 1107, 1123.)

The court concluded in *Harrison* that since the defendant was not in violation of any relevant zoning standards, and since the shredder did not pose an imminent hazard to the public health, the defendant should not be prevented from continuing to operate. The court then ordered that the defendant be permitted a reasonable time to "launder its objectionable features." 528 F.2d 1107, 1125.

This case is readily distinguishable for the reason that the gist of this case is that the defendant is engaged in an extremely hazardous undertaking at an unsuitable location, which seriously and imminently poses a threat to the public health. We are acutely aware that the service provided by the defendant is a valuable and necessary one. We also know that it is preferable to have chemical-waste-disposal sites than to have illegal dumping in rivers, streams, and deserted areas. But a site such as defendant's,

if it is to do the job it is intended to do, must be located in a secure place, where it will pose no threat to health or life, now, or in the future. This site was intended to be a *permanent* disposal site for the deposit of extremely hazardous chemical-waste materials. Yet this site is located above an abandoned tunneled mine where subsidence is occurring several years ahead of when it was anticipated. Also, the permeability-coefficient samples taken by defendant's experts, though not conclusive alone, indicate that the soil is more permeable at the site than expected. Moreover, the spillage, odors, and dust caused by the presence of the disposal site indicate why it was inadvisable to locate the site so near the plaintiff village.

Therefore, we conclude that in fashioning relief in this case the trial court did balance relative hardship to be caused to the plaintiffs and defendant, and did fashion reasonable relief when it ordered the exhumation of all material from the site and the reclamation of the surrounding area. The instant site is akin to Mr. Justice Sutherland's observation that "Nuisance may be merely a right thing in a wrong place—like a pig in the parlor instead of the barnyard." *Village of Euclid v. Ambler Realty Co.* (1926), 272 U.S. 365, 388, 71 L. Ed. 303, 311, 47 S. Ct. 114, 118, quoted in 2 J. Dooley, Modern Tort Litigation sec. 31.15, at 225 (1977).

We are also cognizant of *amicus* USEPA's suggestion in its brief and affidavits filed with the appellate court which urge that we remand to the circuit court so that alternatives to closure of the site and exhumation of the waste materials may be considered. The USEPA states: "Heavy equipment may damage drums, releasing wastes and possibly causing gaseous emissions, fires, and explosions. Repackaging and transporting damaged drums also risks releasing wastes. Workers performing the exhumation face dangers from contact with or inhalation of wastes; these risks cannot be completely eliminated with protective

clothing and breathing apparatus. Nearby residents may also be endangered." It is ironic that the host of horribles mentioned by the USEPA in support of keeping the site open includes some of the same hazards which the plaintiffs have raised as reasons in favor of closing the site.

The USEPA continues that while it is not suggesting a specific alternative remedy to closure, possible alternative remedies exist: "A proper cap of low permeability can ensure that little or no rain water can infiltrate the site, and thus that little leachate will be formed. Leachate-collection sumps can also be installed to remove whatever leachate is formed. Ground water monitoring can generally detect any migration of waste constituents, and counterpumping of contaminated ground water (or other measures) can protect against further migration."

We note, however, that the USEPA does not suggest how the location of the disposal site above an abandoned tunneled mine and the effects of subsidence can be overcome. Instead, the USEPA refers to a report admitted into evidence at trial, which was prepared by a technical evaluation team from the USEPA. The team's report had a limited scope. It only "compares and relates the technical aspects of the facility for disposal of PCB's to the EPA proposed regulations." The team visited the site on June 8, 1977, and discussed the site with defendant's personnel. Extensive technical data were provided to the team by defendant, the IEPA , ISGS, and other sources during the site visit and over the next several months, but the team itself did not collect any soil or water samples for analysis. Thus the team used the same data in reaching its conclusion as were used during the trial by defendant. The team noted the following points:

"(1) The glacial till which lies under the site is quite dense and essentially massive (permeability $10^{-8}$ cm/sec.)."

This finding was effectively refuted at trial.

"(2) The potential for mine subsidence under the site as reported by the ISGS is negligible."

Dr. Augenbaugh's studies, which the circuit court gave more weight, directly contradicted this finding.

"(3) The 14 groundwater and the 3 surface water sampling points around the site are sufficient to detect any contamination of the sand layer or of the surface drainage channels (analyses to date indicate no change in the amounts or types of contaminants compared to those measured from samples taken before the site began accepting waste)."

As previously stated, some of the sampling points are a considerable distance apart, thereby allowing for the possibility that contamination could occur and be undetected. Moreover, though the defendant states that it could easily establish a containment trench to catch any waste migration, since the IEPA does not have such a requirement, the defendant did not build a containment trench. Indeed, IEPA regulations require that Class I disposal sites, such as the instant one, must be secure without the use of containment-engineering techniques. Since the inception of this case, however, the USEPA has adopted regulations which require containment trenches at all chemical-waste-disposal sites.

Finally, Sam Campagna, defendant's former site manager, testified at trial that no test had, as yet, been taken from the samples to detect whether cyanide was present in the monitoring wells, and that, during the quarterly sampling, tests were conducted to detect certain chemicals only. Thus, some chemicals could be present for several quarters before tests would reveal their presence.

"(4) The operation of the site, as demonstrated to the [team] considers those precautions necessary to assure that both the public and the environment are protected.

(5) The site, at the time of the visit, was in good order and the site housekeeping procedures appear adequate."

These findings are in conflict with the defendant's own delivery reports and other evidence adduced at trial which show that many of the drums were brought to the site in a rusting and leaking condition. Also, the evidence of spillage on the streets of Wilsonville, and of rolling drums into trenches instead of carefully lowering them in, fly in the face of the team's report.

"(6) The segregation of PCBs from solvents as practiced by [defendant] will cause the PCBs to be nearly immobile (PCB travel times will be at least 10 to 100 times longer than even the least mobile heavy metals)."

Dr. Hall challenged this finding when he testified that PCBs would be dissolved in the organic solvent components of the paint sludges deposited in trenches Nos. 2, 3, and 4. Moreover, Robert A. Griffin, an associate geochemist with the ISGS, reported to the USEPA that although PCBs are "immobile in soil materials, including pure sand, when leached with water," when "the mobility of PCB's were tested using organic solvents (e.g. carbon tetrachloride, methylene chloride, methanol, and acetone), using the same experimental conditions as on the aqueous solvent tests, the PCB's were found to be highly mobile." Griffin went on to say that as long as PCBs were not disposed in the same trenches with organic compounds that would make PCBs soluble, the possibility of migration of PCBs was nil. Clearly, this precaution has not been followed by the defendant.

Finally, the USEPA's own regulations governing disposal of PCBs, which became effective November 19, 1980, contain the following:

"High temperature incineration is the primary disposal method for PCBs. This disposal method is the only technique that will result in the destruction of PCBs and prevent the eventual escape of the chemical to the environment. Properly operated chemical waste landfills may provide an element of security for the containment of PCBs

for long periods of time, but the ultimate fate of PCBs using this method is unknown.

\* \* \*

All PCB chemical substances, PCB mixtures, PCB articles, and PCB containers are to be disposed of by high temperature incineration with the following exceptions:

    (A) PCB transformers \*\*\*

    (B) Until July 1, 1979, approved chemical waste landfills may be used for the disposal of non-liquid PCB mixtures \*\*\*

    (C) Small PCB compactors that are used in private housing units \*\*\*. (42 Fed. Reg. 26,566 (1977).)

Therefore, the PCBs contained at defendant's site are in violation of USEPA regulations presently in effect, even though it is true that these regulations are not strictly enforced by the USEPA.

The point is that the USEPA is asking this court to remand this cause to the circuit court on the basis of evidence which the trial court has previously considered and discounted in favor of the plaintiffs' evidence. We see no point in doing so. The circuit court carefully weighed the evidence adduced throughout the 104-day trial, balanced the relative hardship to the plaintiffs and defendant of permitting the site to continue to operate, or closing it down, and reached the conclusion which is strongly supported by the record, that the site's dangers outweigh its utility. Moreover, it needs to be remembered, as the trial judge pointed out, that the nuisance in this case came to the village. (See Prosser, Torts sec. 91, at 611 (4th ed. 1971).) The residents of Wilsonville have a right to enjoy and use their property without being unreasonably interfered with by the defendant's hazardous-waste site. Also, there is evidence in the record that representatives of the defendant told the village board, in response to a question from the water works commissioner, that no toxic materials would be buried at the site, when the truth is precisely the opposite. We view these factors as additional reasons why

defendant's conduct is inequitable and why plaintiffs are entitled to a permanent injunction. We conclude therefore that the relief fashioned by the trial court is reasonable under the precise facts of this case and will not be disturbed.

The defendant raises another point that the courts below refused to consider the practicability of exhuming and moving the wastes deposited at the site. Our reading of the opinions of the trial and appellate courts indicates the contrary. Serious consideration was given to available remedies; and it was concluded that exhumation of the materials and reclamation of the site is the best and safest alternative. Additionally, the defendant "concedes" in its reply brief filed with this court that it is possible to excavate the site and haul the materials elsewhere. It disputes, however, the technical and scientific reasonableness of doing so.

First, many of these materials have already been transported once from Dittmer, Missouri, where they were illegally dumped and had destroyed all vegetation for a square mile, to Wilsonville. So it is possible to transport these materials. Second, since the trial court has decided that the likelihood exists that great harm will be done if the materials are *not* moved, it seems only reasonable that the materials must be taken somewhere safer than where they are now deposited. It is the defendant's responsibility to make certain the exhumation is performed in a careful manner.

Finally, the defendant argues that the decisions of the courts below constitute sudden changes in State law and, as such, deprive the defendant of its property without due process of law. (See *Hughes v. Washington* (1967), 389 U.S. 290, 298, 19 L. Ed. 2d 530, 536, 88 S. Ct. 438, 443 (Stewart, J., concurring).) We disagree; the principles of law applied in this case are neither new, unreasonable, nor unpredictable. Manifestly, a party cannot expect to oper-

ate a site in the manner and in the location the defendant has chosen and expect to be immune from liability for creating a public nuisance. Defendant's argument has no merit in this case.

Accordingly, for all the reasons stated, the judgments of the circuit and appellate courts are affirmed and the cause is remanded to the circuit court to enable it to retain jurisdiction to supervise the enforcement of its order. See *Hake v. People* (1907), 230 Ill. 174, 196; *Melbourne Corp. v. City of Chicago* (1979), 76 Ill. App. 3d 595, 611.

*Affirmed and remanded.*

MR. JUSTICE RYAN, concurring:

While I agree with both the result reached by the majority and the reasoning employed supporting the opinion, I wish to add a brief comment. In response to the defendant's argument that the trial court failed to apply the proper standard for determining when a prospective nuisance may be enjoined, the majority concluded that the court had in fact applied the correct rule as set out in *Fink v. Board of Trustees* (1966), 71 Ill. App. 2d 276. I am concerned that the holding of *Fink,* quoted by the majority (86 Ill. 2d at 26), may be an unnecessarily narrow view of the test for enjoining prospective tortious conduct in general. Any injunction is, by its very nature, the product of a court's balancing of competing interests, with a result equitably obtained. Prosser, in discussing the law of nuisance, quoted by the majority (86 Ill. 2d at 26), states:

> "[I]f the possibility [of harm] is merely uncertain or contingent [the plaintiff] may be left to his remedy after the nuisance has occurred." Prosser, Torts sec. 90, at 603 (4th ed. 1971).

Prosser thus recognizes that there are cases in which the possibility of inflicting harm is slight and where the plaintiff may be left to his remedy at law. However, I believe that there are situations where the harm that is

potential is so devastating that equity should afford relief even though the possibility of the harmful result occurring is uncertain or contingent. The Restatement's position applicable to preventative injunctive relief in general is that "[t]he more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing the harm too remote." (Restatement (Second) of Torts sec. 933, at 561, comment *b* (1979).) If the harm that may result is severe, a lesser possibility of it occurring should be required to support injunctive relief. Conversely, if the potential harm is less severe, a greater possibility that it will happen should be required. Also, in the balancing of competing interests, a court may find a situation where the potential harm is such that a plaintiff will be left to his remedy at law if the possibility of it occurring is slight. This balancing test allows the court to consider a wider range of factors and avoids the anomalous result possible under a more restrictive alternative where a person engaged in an ultrahazardous activity with potentially catastrophic results would be allowed to continue until he has driven an entire community to the brink of certain disaster. A court of equity need not wait so long to provide relief.

Although the "dangerous probability" test has certainly been met in this case, I would be willing to enjoin the activity on a showing of probability of occurrence substantially less than that which the facts presented to this court reveal, due to the extremely hazardous nature of the chemicals being dumped and the potentially catastrophic results.